AMES *et al.* *v.* AMES *et al.*

*(Circuit Court, D. Minnesota.* December 11, 1888.)

1. PARTNERSHIP—PARTNERSHIP PROPERTY.
 At the formation of a partnership for carrying on the milling business the property in controversy was purchased, a small part of the price being paid in cash, and taken possession of, and used for the partnership business, and the balance of the price was paid out of the earnings of the mill, and a large amount of the profits expended in improvements thereon. There was no agreement between the partners by which the property was to become partnership property, and the title stood in the individual names of the partners, but in exact proportion to their respective interests in the partnership; and, upon the several readjustments and conveyances of interests in the partnership, deeds were given for proportionate interests in the property. *Held*, that the property was, as to creditors, partnership property, especially as under the laws of the state where the property was situated the proper mode of transferring title was to the individual partners.

2. SAME—FIRM AND INDIVIDUAL CREDITORS—SUPERIOR EQUITY.
 One who has advanced money to enable one partner to purchase an interest of another, has no equity superior to that of the partnership creditors, though the advancement was made on the promise of the partner to secure him by mortgage, and at a time when there were no partnership debts.

In Equity. On final hearing on pleadings and proofs.

Bill by John T. Ames and others against Adelbert Ames and Benjamin F. Butler, to dissolve a partnership, and for an accounting, and for an injunction against attachment proceedings by Butler against the interest of Adelbert Ames in the partnership property.

*Gordon E. Cole* and *Young & Lightner*, for complainants.

*M. R. Benton*, for defendants.

BREWER, J. This case is submitted for final hearing on the pleadings and proofs. The single question for present determination is whether certain mill property is to be treated as partnership or the individual property of the three persons who formed the late partnership of "Jesse Ames' Sons." A brief statement of the general history of this mill property for the last quarter of a century will pave the way to a clear understanding of the question, as it is now presented, and the considerations which must necessarily affect and determine the answer thereto. In 1864, the property was first purchased by the Ames family. At that time a partnership was formed by the name of "Jesse Ames & Co.," for

the purpose of carrying on the milling business, and the milling property in question was purchased at the agreed price of $25,000. Adelbert Ames put in $2,000. Jesse Ames, his father, a farm at Cannon City, some cash, a thousand or two bushels of wheat, and a span of horses; leaving a balance remaining on mortgage, which was subsequently paid out of the earnings of the mill. John T. Ames, a son of Jesse, and brother of Adelbert, had no money to put into the business, but, as he testifies, was to have a salary and a portion of the earnings until he had acquired an interest. This partnership of Jesse Ames & Co. took possession of the mill property, and ran the mill, and out of the earnings paid the mortgage given to the original vendor. During this time Adelbert Ames was away in the army, and and the business of the partnership was carried on by his father and brother. In 1867 there was a re-arrangement. Deeds were exchanged, by which a one-quarter undivided interest in the mill property was vested in Adelbert, one-eighth in John T., while Jesse Ames, the father, retained five-eighths; and a new firm was formed by the name of "Jesse Ames & Sons." Subsequently Jesse Ames conveyed a further one-sixteenth to John T. Ames. There was no partnership contract reduced to writing, and the interests of the partners in the partnership were the same as their interests in the mill property. The milling business was very prosperous. Large profits were made, and something like $100,000 expended in improving this property. This continued until 1876, at which time the legal title to the mill property stood nine-sixteenths in Jesse Ames, three-sixteenths in John T. Ames, and four-sixteenths in Adelbert Ames. At that time a new arrangement was formed, by which one-half was conveyed by Jesse Ames to Adelbert Ames, giving him an undivided three-fourths interest; and one-sixteenth to John Hanley, who had been theretofore the foreman in the mill; and a new firm, by the style of "Jesse Ames' Sons," was organized. Adelbert Ames' purchase from his father in 1876 of the undivided half was for the sum of forty thousand dollars, of which twenty-five thousand dollars was loaned to Adelbert by Gen. Butler, and the other fifteen thousand borrowed on the credit of Gen. Butler's indorsement of Adelbert's paper. After this new partnership was formed, the milling business ceased to be as profitable as it had theretofore been. The firm began to run behind, until, in 1886, it was found impracticable to continue longer in business. In May, 1886, Gen. Butler commenced suit against Adelbert Ames to recover the $25,000 loaned, less $2,000 paid, and in that action attached his interest in the mill property. Thereupon the present complainants, the other partners of Adelbert, brought this action to dissolve the partnership, obtain an accounting, and also seeking to enjoin the further proceedings under that attachment of Gen. Butler, until the firm debts had been paid.

It is undisputed that the firm is insolvent, and that, even if the entire mill property be considered as partnership property, and sold for the satisfaction of the partnership debts, they will not all be paid; so that the contention of the present complainants is that Adelbert Ames' individual debt to Gen. Butler must be subordinated to the prior claims of

the partnership creditors; and that presents what, as I have stated, is the only question in this case,—whether the mill property was partnership or individual property. It is not pretended that there was any express contract between the partners by which this mill property was to become partnership property, nor can it be claimed that the mere fact that property is used by a partnership makes it partnership property. It is also true that from the first inception of the business, in 1864, and during the continuance of the three several partnerships, the title to the mill property stood in the individual names of the partners, and in exact proportion to their respective interests in the partnership. The contention of complainants is that there was an implied agreement between the partners that this mill property should be considered as partnership property, and that the course of business during the years of these several partnerships was such that creditors and others having dealings with the partnership had a right to assume that this mill property was partnership property, and extend credit to the partnership on the faith thereof. On the part of the defendants it is insisted that the mill property was individual property, as shown by the deeds, the legal title of the undivided interests being confessedly in the several partners; that there was neither an express nor implied agreement that it should be considered partnership property; that the title stood of record, and all parties were charged with notice of its exact position; and that defendant Butler, having advanced the money for the purchase by Adelbert Ames of the one-half interest conveyed to him in 1876, (that conveyance being made under a promise to execute a mortgage as security therefor,—a promise known to the other partners at the time of the purchase,—and a promise made at a time when there were no debts against the partnership, and therefore nothing to prevent one partner from incumbering his individual interest,) has a right in equity to insist that such interest shall be subjected to the payment of his individual debt in preference to any subsequently accruing partnership claims. It may be premised also, at the outset, that it is not easy to reconcile the various decisions rendered on the question whether property, the title to which stands in the names of individual partners, is to be considered in equity as partnership or individual property. I shall not attempt any review of the various cases cited by counsel. Some of them consider only the question, what rights will exist as to real estate standing in the name of individual partners, which in fact belongs to the partnership. Others discuss the question whether a parol agreement is sufficient to convert individual real estate into partnership property. Of course these cases throw no light upon the question before us; while others, which discuss the question as to what is necessary to show that real estate standing in the name of individual partners is to be treated as partnership property, rest their conclusion upon single or more facts not existing in this case, and which by those courts were deemed decisive of the question. These also furnish little help in the case at bar. There is truth in the observations of Judge FLANDRAU in the case of *Arnold* v. *Wainwright*, 6 Minn. 358, (Gil. 241,) as follows:

"The elementary writers do not furnish a very satisfactory solution of the question as to what character of agreement between the parties will work a conversion of lands into partnership stock. They agree that it may be accomplished by agreement, express or implied; and we think it is the necessary result of their views, as expressed in their text and the numerous cases cited by them, that the intention of the partners, to be ascertained from their acts or agreements, is to govern, and that no express agreement in writing is necessary."

And following the suggestions there made, it may be affirmed that no written agreement is necessary; that no parol express agreement, even, is necessary, for a court of equity to hold that real estate standing in the names of individual partners is partnership property, and it is enough if, from all the acts and conduct of the partners, the court can be satisfied that it was the thought and intent of the partners to treat it as partnership property. And that opens the door to the consideration of the facts in this case. While it is true that from the purchase in 1864 there were three partnerships, yet in all of them the Ames family had the sole or controlling interest, so that it would be fair to speak of this property during all these years as the Ames mill property. Now, while it is true that the absolute rights of the partners between themselves in this last partnership must be determined by the real agreement between the partners, irrespective of anything that took place in the prior partnerships, yet when, as conceded, there was no express agreement, the circumstances and relations of the prior partnerships very largely foreshadow and interpret the real intent and agreement of the present partners. Now, looking backward to the year 1864, it is evident that the property was bought for the business. Neither of the partners was in the milling business, or had any pecuniary interest in such business. They proposed to engage in such business, and bought this property therefor. The property was not purchased as an independent speculation, nor as an aid to a business already established, but it was purchased for the purpose of doing the milling business and employment therein. But a small cash payment was made, and the balance of the purchase money was paid out of the profits of the business. If you put out of sight the location of the legal title, and consider simply the other undisputed facts, that the Ames family purchased the mill property for the purpose of engaging in the milling business, paying largely therefor out of the profits of the business, the natural inference would be that the property belonged to the same partnership that conducted the business.

But it is said by counsel for defendants that the legal title was taken in the names of the individual partners; that the fact that the conveyances were so made indicates the intent to make the property individual, rather than partnership, property; and that, in the absence of an express agreement, in order to establish an implied agreement that this property, whose title was thus located in the individual partners, was to be partnership property, the facts shown must be such as to be necessarily inconsistent with the intent to leave the ownership where the title deeds put it. I cannot agree with counsel's view of the significance of the conveyances, and the location of the legal title. In the first place, the fact

that the legal title corresponded with the partnership interest, and was changed by conveyances as these interests changed, indicates that this property was all the while partnership property. Superadd to that the fact that in the transactions by which the partnership interests were changed and the title conveyed there never appear to have been any separate negotiations as to the business on the one hand and the real property on the other. There was never a transfer of a partnership interest without a corresponding and proportional conveyance of the real property, and there never was a trade for an interest in one independent of a transaction for a conveyance of a like interest in the other. This harmony of interests in the business and the ownership in the real estate, together with the singleness of the transactions by which the transfers of both were made, is very significant of the understanding and real agreement between the partners. More than that, unquestionably the true way to locate the legal title was in the names of the individual partners. A conveyance to a partnership, as such, while it would doubtless transfer the equitable, might not, at least, transfer the legal, title. In *Morrison* v. *Mendenhall*, 18 Minn. 232, (Gil. 212,) the court thus expresses itself:

"A conveyance of real estate, or of an interest therein, must run to some person, (a corporation being regarded in law as a person,) and a partnership, as such, not being a person, conveyances of real estate for the use and benefit of a partnership have usually and aptly been made to the individual partners jointly, as tenants in common. Colly. Partn. § 133 *et seq.* and notes; Pars. Partn. c. 41, § 2; *Dyer* v. *Clark*, 5 Metc. 562; *Howard* v. *Priest*, Id. 582. If, then, the mortgage in this case was taken for the use and benefit of the partnership, it was, in accordance with common usage, properly made to run to the individual partners as grantees."

And in *Tidd* v. *Rines*, 26 Minn. 201, 2 N. W. Rep. 497, may be found this language:

"As the legal title to real property can only be held by a person, or a corporate entity, which is deemed such in law, it follows that the conveyance in question vested no legal title or estate in the grantee therein named, because a partnership, as such, is not recognized in law as a person."

As, therefore, under the laws of Minnesota, a conveyance to the partnership was not the proper mode of transferring title, it would be strange if the conveyance to individual partners carried with it that significance and potency which counsel for defendants claim. On the contrary, it seems to me the rule is as heretofore indicated, that, in the absence of express agreement, no one matter is conclusive upon the question of intention; and that, from all the facts, the court is to deduce and determine the real intent of the partners.

I have already referred to the significance of the original purchase by the members of the Ames family; that it was a purchase for the purpose of commencing the business,—a business never before engaged in by the partners, and with that intent alone; that every change in partnership interest was accompanied by a corresponding change in the legal title; that no separate negotiations were had for the transfer of the interest in the partnership and the conveyance of the title, but the latter seems always to be accepted as a necessary result of the former. Beyond these

matters must also be noticed the large improvements, costing over $100,-000, made upon the property, and paid for out of the business. It is true, defendant claims that this appropriation of partnership funds to the improvement of the property is to be considered as a mere matter of dividends, and that it is entirely consistent with the idea of individual ownership. While it may be consistent with that idea, yet nothing was said about a dividend, and apparently a mere accumulation of the profits of the partnership business was expended in making the property more serviceable for partnership purposes, so that the more natural thought is that the firm was using its partnership profits to improve its partnership property. Again, when the books of the present partnership were opened, the following entry was made therein in reference to the mill property:

"NORTHFIELD FLOURING MILLS.

"Jesse Ames' Sons, to Mill property in Northfield, Minnesota, and improvements the old and new mills, $1.00."

Thus it appears that the real property was entered upon the books of the firm as a part of the assets; and that this entry was known to the defendant Adelbert Ames, is, I think, very satisfactorily shown, and, while I do not place so much reliance as counsel for complainant upon the significance of this book-entry, yet it is in harmony with the purpose evidenced by the transactions heretofore noticed. Indeed, such an entry seems inconsistent with the idea of individual ownership of the real estate. As such it is testimony worthy of consideration. Beyond that, though of minor significance, are the insurance policies and tax receipts. I say, "minor significance," because, while some of them indicate partnership ownership of the property, they are not uniform in their language, and some, at least, are consistent with individual ownership. Furthermore, it is obvious that the property was known as the "Ames Mill Property," and that persons dealt with the firm and trusted it on the strength of its supposed ownership of the property. Of course, it may be said that all the parties are bound by what the record shows as to the legal title, but still, with the law of Minnesota such as it is in respect to conveyances to partnerships, the significance of this dealing and reliance upon the part of third parties is no trivial element. Furthermore, suits for damages for flowage, and proceedings in court, while perhaps consistent with individual ownership, are at least suggestive of, and point towards, partnership ownership. I refer to these matters only in a general way.

The testimony is voluminous, and it would be a waste of time and paper to detail all the facts and circumstances. The significant ones I have indicated, and in my mind they leave little doubt that from the inception of the purchase, in 1864, to the commencement of this suit it was the understanding of the partners that this real estate was part and parcel of the partnership property.

The other question remains, whether Gen. Butler has a right in equity to insist upon a preference in the matter of his claim by reason of the

fact of his advancing the money to pay for the purchase of the half interest conveyed in 1876 by Jesse Ames to Adelbert Ames. At first blush it appears plausible that, having put $25,000 in on the promise of a mortgage, at a time when there were no partnership debts, he has an equity superior to that of partnership creditors; but a little reflection will make it clear that this claim is without foundation. It is not a case of a third party putting money into the partnership upon an agreement for mortgage security. Gen. Butler's money added nothing to the resources of the partnership. It was simply money used between one partner and another, to effect a change of interest. As between the firm and its creditors it meant nothing. Whether Jesse Ames or Adelbert Ames was partner was to them immaterial. They took nothing by the change in interest, hence their equities remain the same as though there had been no transfer from one partner to the other. Their rights and equities are the same, their claim upon the partnership property the same, whether one partner gives or sells a portion of his interest to another partner. I think the supposed equity does not exist. This disposes of this case, and a decree will be entered for complainants, as prayed for.