JOHNSON *v.* HOGAN.

CLEVELAND-CLIFFS IRON CO. *v.* HULL.

1. PARTNERSHIP—REAL PROPERTY—EVIDENCE OF TITLE.

Whether lands held in the name of one partner or of all are to be deemed copartnership property is generally a question of intent, to be gathered from the manner in which the members of the firm have dealt with the property,

2. SAME—EXPRESS AGREEMENT—NECESSITY.

No express agreement is necessary to establish the equitable interest of a copartnership in property held for the benefit of the firm in the name of one of the partners, nor need the circumstances surrounding the transaction or the dealings of the partners with the property be equivalent in weight to an express agreement, if. the agreement may be implied from their purpose, business or their dealings with the real estate.

3. SAME—TRUST ESTATES—EVIDENCE.

It is not necessary to title in the partnership that the lands should have been purchased with partnership funds, since it may have been contributed by the member as a part of the firm capital.

4. ESTOPPEL—REAL PROPERTY—EQUITY.

While title to real estate cannot be divested by estoppel at law, equity may enforce the claim as against the legal title.

5. PARTNERSHIP—REAL PROPERTY—TITLE OF LANDS IN ONE PARTNER'S NAME.

Real property held by one partner in his own name and treated by him and by his associates, with his knowledge, as copartnership property, will be treated in equity as assets of the partnership.

Appeals from Marquette; Stone, J. Submitted April 8, 1909. (Docket Nos. 15, 16.) Decided December 10, 1909.

Bills by Charles Johnson and the Cleveland-Cliffs Iron Company against Philip J. Hogan and others, and by the Cleveland-Cliffs Iron Company against Louise T. Hull

and others, to quiet title to land. From decrees for defendants, complainants appeal. Reversed, and decrees entered for complainants.

*William P. Belden* (*Hoyt, Dustin, Kelley, McKeehan & Andrews*, of counsel), for complainants.

*A. B. Eldredge* and *A. E. Miller* (*Benton Hanchett*, of counsel), for defendants.

BROOKE, J. The foregoing are companion cases; the determination in either being controlling of the other. We will consider the first of the two cases.

The amended and supplemental bill of complaint avers: That the complainant, the Cleveland-Cliffs Iron Company, is the owner in fee simple of lots 7, 8, and 9 of section 36, township 45 north, range 25 west, Marquette county, Mich., and is in constructive possession of said premises, and no one is in actual possession thereof. That it had on November 25, 1905, acquired title thereto by a proper deed from complainant Charles Johnson and his wife, Louise Johnson. That said Charles Johnson had on the same day acquired title thereto by a proper conveyance from the widow and heirs of Isaac Johnson, deceased, who were at that time the owners in fee simple of said premises. Further, that the defendant Hogan had acquired certain tax titles covering said lands which the complainant had on September 30, 1905, sought to redeem by tendering to said Hogan the sum of $288.32; that being the amount required to redeem from said tax purchases. That the original bill of complaint was filed to compel redemption from Hogan, and to acquire title.

To which original bill defendant Hogan answered, denying, in substance, the title of complainants to said lands, and alleging, on the contrary: That one Henry Hull was at the time specified in the bill the grantee under the last recorded deed of the lands described in said bill of complaint, and claiming that he (said defendant) had caused due notice of his tax deeds to be served and published ac-

cording to the statute in such case provided, and claiming to be the absolute owner of said land. That after the filing of the original bill and the answer thereto, the complainant learned that Mrs. Louise T. Hull, widow of Henry Hull, claimed to be the owner of said lands, and that about March 1, 1906, said Louise T. Hull executed and delivered a quitclaim deed of said lands to one John R. Gordon of Marquette, Mich., reserving to herself a one-eighth interest in the ores and minerals in and under said land, and all the timber thereon, with the right to remove the same within three years, which deed was, on March 15, 1906, recorded in the office of the register of deeds of Marquette county. That on, to wit, March 15, 1906, said John R. Gordon claimed title under said deed and caused to be deposited with the register in chancery of Marquette county the sum of $233.02 for the purpose of redeeming from the tax sales to Hogan. That said John R. Gordon and Mrs. Louise Hull now claim to be the owners of said lands in the proportion stated in the deed last above mentioned. That said Louise T. Hull claims title to the premises under and by virtue of the terms of the will of one Alfred Hull, who died at Escanaba, December 1, 1874, and by the terms of which will all of his property was devised and bequeathed to his two brothers, Thomas Hull of Chicago, Ill., and said Henry Hull of Fond du Lac, Wis. That Thomas Hull died December 31, 1885, leaving a will, by the terms of which said Louise T. Hull claims that said Henry Hull became entitled to the right, title, and interest of the said Thomas Hull, and, as she claims, the entire estate in said property, by reason of which she, at the time of the execution of said deed to John R. Gordon, asserted and claimed to be the owner of the premises hereinbefore described.

Complainant avers further: That said Louise T. Hull and her grantee, Gordon, have no right to the title or interest in said premises, and set out as reasons for said claim that on or about the 1st day of November, 1866,

Alfred Hull of Escanaba, Mich., Robert A. Connolly of Waukegan, Ill., and S. C. Baldwin of Escanaba, Mich., formed a copartnership, under the name of R. A. Connolly & Co., for the purpose of carrying on the business of manufacturing, sawing, and selling lumber, and of obtaining timber lands, and of operating a steam sawmill at or near Little Lake station on the Peninsula division of the Chicago & Northwestern Railway. That said Hull, Connolly, and Baldwin, for the uses and purposes of said partnership, and as a part of the property of the same, and for the purpose of supplying said mill with lumber and timber, agreed to, and thereupon did proceed to, enter certain descriptions of government land in township 45 north, range 25 west, in Marquette county, Mich., adjacent to or in the vicinity of said mill, and obtained the patents therefor in the names of said individual partners; some being taken in the name of Hull, some in the name of Baldwin, and others in the name of Connolly, but that all so entered were taken and patented in trust for the uses and purposes of the partnership, which thereupon was the real and equitable owner of all the lands. That among the lands so entered, patented, and purchased for the purposes of said partnership were the lands in controversy in this suit, which were entered on the 13th day of December, 1866, in the name of Alfred Hull. That, after carrying on the affairs of the partnership for some time, Hull entered into an agreement with Baldwin, by which he contracted to convey and sell to Baldwin all his interest in said partnership property, including said lands. That, after being paid the consideration to be received by him, Hull turned over to Baldwin his entire interest in said partnership property, and that said instrument of conveyance from Hull to Baldwin has been mislaid and lost. That after said sale Baldwin and Connolly continued to carry on the business of the partnership, taking the timber as well off the Hull lands as the other lands, until 1871, when Baldwin retired from said partnership and conveyed all his right, title, and interest to said part-

nership, and the lands operated in connection therewith, including the Hull lands, to Samuel H. Hartman and Theodore W. Hartman.    That this deed from Baldwin to the Hartmans has likewise been lost.    That the Hartmans paid Baldwin the full purchase price, and the Hartmans and Connolly continued thereafter to operate the property until the 16th day of November, 1874, when it was sold to Isaac Johnson.    Prior to this date said Johnson had been operating the mill for Hartman, Connolly & Co.    In the course of said operation, the firm had become indebted to Johnson in the sum of $5,000.    On the said 16th day of November the two Hartmans entered into a contract with Johnson agreeing to convey to him a two-thirds interest in said business and lands, including and describing the Hull land, for the sum of $11,222.34, and on the 23d day of November, 1874, Connolly contracted to sell his one-third interest to Johnson at the same rate; the Hull lands being likewise included therein and specifically described.    That thereafter said Johnson took possession of said property, paid the consideration mentioned in said contracts, and lumbered said tract for a period of upwards of 10 years.    That on the 3d day of January, 1876, Connolly executed a quitclaim deed to Johnson in pursuance of said contract; said deed specifically describing the Hull and Baldwin lands, as well as those entered in Connolly's name, which deed was duly recorded.    That said Johnson continued in full possession and control of the property, including the lands in question, until his death, in November, 1883.    That neither the Hartmans nor their heirs have executed a conveyance, in accordance with the contract, of their two-thirds interest.

The prayer of the complainant is:

(1) That said complainant, the Cleveland-Cliffs Iron Company, be decreed to be the owner in fee simple of the lands hereinbefore described, and that its title thereto be quieted, confirmed, and established.

(2) That said Louise T. Hull and John R. Gordon be permanently restrained from interfering with said com-

plainants in the possession of said premises and from claiming to own the same.

(3) That the unknown heirs of each said Samuel H. Hartman, Theodore W. Hartman, and C. G. Hartman be required to specifically perform the terms of said contract, and that they be decreed to release and quitclaim to said complainants all their right, title, and interest in and to said premises.

To this bill of complaint defendants John R. Gordon and Louise T. Hull Morehouse, formerly Louise T. Hull, filed separate answers in the nature of cross-bills, averring: That Alfred Hull, the original patentee of the lands in question, died without having parted with the title to said lands and disposing of them by will to the two brothers Thomas and Henry; that Thomas had not parted with his interest in said lands, leaving the property to his brother Henry; and that Henry died intestate, leaving defendant Louise T. Hull, his sole heir; praying that defendants' title may be quieted by the decree of the court, and that defendant Hogan be decreed to reconvey his title acquired by the tax deeds. Hogan answered setting up absolute title to the lands in question under his tax conveyances. The record shows, however, that he has accepted redemption from one or the other of the parties litigant, and has now no interest in the controversy.

But one question is involved in this case, viz., whether or not the lands in controversy became in fact, or should now be treated as, the property of the firm of R. A. Connolly & Co. It is apparent that the complainant, by virtue of the conveyances from Johnson, has acquired the interest in the partnership of Baldwin and Connolly. By virtue of the same conveyances, it has likewise acquired title to the Hull lands, if those lands were in fact partnership property, although entered in the individual name of Hull. After a full hearing the learned circuit judge reached the conclusion that the complainants were not entitled to the relief sought, and entered a decree giving the title to the lands in question in defendants Gordon and Hull. From this decree complainants appeal.

The record is of great length and contains many exhibits. For the purpose of showing the intent of the parties as to the character of the interest of the partnership in the lands in question, complainants rely, in part, upon the following written items of evidence:

(1) The original partnership agreement is as follows:

" Memo. of agreement made this first day of November, 1866, by and between R. A. Connolly, of Waukegan, Lake county, Ill., S. C. Baldwin of Escanaba, Delta county, Mich., and Alfred Hull of said Escanaba:

"Said parties have formed a copartnership for the purpose of carrying on the business of sawing and selling lumber, and put into operation a steam sawmill, at Little Lake station on the Peninsula Division of the Chicago & North Western Railway. It is understood and agreed that each party interest in said mill and business is one-third. Each is to pay one-third of the whole cost and losses, if any, and to receive one-third of the profits, if any. Said Connolly is to render at once a statement of the cost of said mill, with the vouchers. The proceeds of lumber sold after reserving the cost of sawing, *and furnishing*, are to be applied first to the payment of all bills, for labor and material, now unpaid. When these are paid in full, then the profits, if any, are to be divided equally between said partners, each and every month. Said Hull is to keep accounts of the sales of lumber, and said Connolly or Baldwin are to collect said bills as rendered by said Hull, and each party is to use all proper exertion for the success of said undertaking, and to give such portion of his time to such purpose, as he may be required by the other parties, reasonably, to do. All notes or evidences of indebtedness against said property shall be signed by all three partners, and neither of the partners shall assign or sell his interest without the consent of at least one of the other partners in writing. The term of this partnership is to be for three years from this date, unless sooner terminated by the consent of the parties.

"S. C. BALDWIN.  [Seal.]

"R. A. CONNOLLY.  [Seal.]

"A. HULL.  [Seal.]

" In presence of :  ————. "

(2) Correspondence antedating the copartnership agreement between Hull and Connolly, as follows:

"ESCANABA, June 30th, '66.
"R. A CONNOLLY, Esq.,

"*My Dear Sir:* Mr. Baldwin handed me a letter last evening which he had just received from you, in which you state that you have purchased engine and mill fixings, at a cost of sixty-three hundred dollars, cash down. The capital that it will require to start and stock the mill will be so large that my proportion of the same would exceed my cash funds, and therefore would be but a weak limb in the concern. It won't do for me to undertake what I can't fulfill. At the same time I will act in the same manner as though I was a partner. I have but a moment to write you. When I see you will explain to your satisfaction. There are *plenty who will gladly take the chance. The timber land has been secured by Mr. Baldwin.* I have not said a word to him as to how I was situated, as he might want, with you, I can reason and will go as far as able, say $1,500. (I think Clark like would join.) Wait completed drawing piles on the 16. Hope to complete the merchant dock bef. Tuesday night. One word more. Now Mr. Connolly don't judge me harshly in this case. I want to see you and talk the whole matter over with you quietly. With kind regards, I remain,            "Respectfully yours,
                                        "A HULL."

"R. A. CONNOLLY, Esq.,

"*Dear Sir:* I had a long conversation with Mr. Baldwin on yesterday in regard to sawmill. He still thinks it a good investment, and I rather infer that he may think that. I have been boyish in the premises. At any rate I told him, as I told you, that I would still, if necessary, put in fifteen hundred dollars, but still I don't change my mind in regard to the results. We digested the matter *I think carefully. His proposals are generous indeed,* but are they sure he says so and so will be wanted, granted they will be? Will it be certain that they will be wanted from our mill? That is a point we want to be very certain about. For without the constant patronage of the company the mill would be a certain loss and a very small margin at best—but it is useless for me to repeat what we talked carefully over, when at Escanaba. I merely write you confidentially knowing that he has recently written you about the mill. If you say build the mill, why I am with you.            "Yours respectfully,
                                        "A. HULL.

" P. S.   We have had splendid weather for driving. I think they will about complete the driving for main dock this week.   I think it will look bad as an improvement that is the location.   (C. E.) "

" Peninsula Division (F. 125), Chicago and North Western Railway Co., Land office.

"Escanaba, August 30, 1866.
"R. A. Connolly, Esq.,

" *Dear Sir:* I have been so very busy since you left that I have not had the time to write you sooner.   Have been urging the work along at Lake for Mill.   Gourlay will be able to commence the frame on Wednesday and wishes me to say to you that he would like a drawing showing the position of the machinery, when at work.   Thinks it would enable him to get along with the work faster.   The side track will be completed during the week.   Have urged that part as far as I dare.   In fact thus far the work has gone very satisfactory, but at the same time I hope it will be convenient for you to be at Escanaba soon, as it is all important that the mill should be at work as soon as the 20 of September.   You of course understand that part.   I shall keep the work moving in your absence. There is one point that is plain to be seen, if *the concern is made to pay for itself*, we have got to put our shoulders to the wheel.   I can see (a doubt) but I don't consider this the time to look back.   We can and will make the mill pay.   Mr. Baldwin has been very ready to do anything that he could to forward the work.   We are looking very anxiously for the Home and will keep Chapman and men employed until it comes.   He will have the house about completed by Tuesday night.   In fact if he should remain there the balance of the week, he would be very useful, to the work generally.   Lynnan will commence hauling long piles at once.   As soon as he gets enough on hand, will have them brought down.   Mr. Baldwin is very much opposed to working on Sunday, and it can also be avoided, so soon as the side track is completed, which I think will be done in time.   Hoping to see you soon at Escanaba, I remain, dear sir,
" Respectfully,

"A. Hull."

(3) Letter from Hartman to Connolly:

"Negaunee, Nov. 19, '74.
"R. A. Connolly, Esq.: Yours of 16th duly to hand,

and am sorry it did not come sooner, as I consummated sale to Isaac on Monday last (as I led you to anticipate would be unless I heard from you by return mail or telegraph). But I rather think he will take your interest on the same terms and figures that he took ours (details of which you will observe in mine of 5th inst., *i.e.* approximately). And so I think Isaac will still do. As he uniformly has done just as we agreed upon, and his proposition was really based on including your interest (less of course the $700 you owe him). As to conferring with your attorneys, Ball & Black. If there is any particular or special point you wish me to ask, advise, and I will do so with pleasure, but as to this sale I see nothing to ask them, as we merely agree to give Isaac the mill property and the Negaunee yard free of incumbrances, *and same title as S. C. Baldwin gave us,* and we don't have to give that until he pays the notes, as we reserve that as collateral. So, if that is satisfactory to you advise at once and I will try and close you out before I leave. Isaac will be here next Monday or Tuesday.

[Signed]        "T. W. HARTMAN."

(4) Contracts between the Hartmans, Connolly, and Johnson, already referred to in statement of complainants' claims in their bill of complaint.

(5) Memorandum of effects attached to will of Alfred Hull:

"Memo. of effects and will of A. Hull made at Chicago, Ill., February 22, 1871:

"Memorandum of bonds, mortgage, etc., belonging to A. Hull with their Nos. for a memorandum in case they should be lost or stolen after this 21st day of February, 1871:

"Nos. of U. S. Gov. 5–20 bonds, viz.:

"130986 for 1,000 dolls.

"130985 for 1,000 dolls.

"Mem. & Nos. of stock by him in the First National Bank of Marquette, viz.:

"5 shares of $100 Ea. Nos. 236.

"5 shares of $100 Ea. Nos. 200.

"4 shares of $100 Ea. Nos. 226.

"The premium on the above is worth 2,100 dolls.

"321 dolls. deposited in the First National Bank of Marquette.

"*A note against S. C. Baldwin and R. A. Connolly, dated Escanaba, June 1, 1867, for 560 38 / 100 dolls.*

"Also Note against C. C. Elliott, dated Escanaba, May 9, 1867, for 900.00 dolls.

"Also Amt. paid Emory per his order, dated Aug. 29, '67, for 50.00 dolls.

"Also $25 paid for filing *caveat* on scrapers.

"Also a note from A. I. Smiley dated Escanaba, Nov. 18, '68, for 80.00 dolls.

"Also a note from O. C. Hill, dated Escanaba, Sept. 1, 1870, for 3,000.00 dolls.

"Also a due bill, dated Escanaba, March 1, '70 from O. D. Sloat for 40.00 dolls.

"Amount deposited with Thos. Hull for safe-keeping this 22d day of February 1871, is 5,000 dolls.

"I have expressed to Judson Bank Ogdensburg today, Feby. 22, '71, 7,000 dolls. which will remain in the express office until my arrival.

"I have mortgages in T. B. Tate's possession, Ogdensburg, amounting to 4,000 dolls.

"I hold a mortgage against T. B. Tate, Ogdensburg, for $5,000.

"Also I have the fol. Amt. of real estate in Ogdensburg, viz., as per will of Chas. Hull, valued at 7,000 dolls.

"I have four lots in Escanaba as per deeds recorded, worth 3,000 dolls.

"I have also an undivided one-half of 6 lots in the town of Ishpeming, worth 400 dolls. each, amounting to 2,400 dolls.

"Also with R. A. Connolly I have an undivided one-third interest in 540 acres of Land in Delta Co., Mich., as per deeds recorded.

"Also I have an undivided one-half interest with S. H. Selden in 280 acres of land situated in Delta Co., Mich.

"Also 250 acres of land situated near Days River, Delta Co., Mich., valued at 5,000 dolls."

(6) Extracts from letter of Dodge, manager of sawmill, to Connolly, August, 1867, as follows:

"*The company will have to buy more land, as there are no more white pine trees on the place where O'Brien has been cutting all summer.*"

Letter of Dodge to Connolly, dated September 2, 1867:

"I think Mr. Baldwin & Hull will go up to the mill to-

morrow and go down to the camp and on the lines of the land to see what amount of trees you have there."

Hull never recorded patents to any of this land. The patent to the land involved in the case under consideration (the Gordon case) was not recorded until November 2, 1876), two years after Hull's death, and nearly two years after the purchase by Johnson. The patent for the land involved in the Drake case has never been recorded, and was not found among the papers of Alfred Hull or produced by the defendants. At the time of the purchase by Isaac Johnson, there were no instruments of any character recorded in the office of the register of deeds for Marquette county, touching these lands, and the Johnson contracts were the first instruments of record in that office The record shows: That Baldwin, Connolly, and Hull all occupied official relations to the Chicago & Northwestern Railway Company; that that company was using in constructing bridges, ore docks, etc., a considerable amount of timber; and that they believed a profitable lumber and timber business might be done with the railway and the public generally. It shows that prior to the formation of the partnership, Baldwin and Connolly had purchased an engine and mill fixtures to the amount of $6,300, and that Hull's available capital at the time that the partnership was entered into was only $1,500. The partnership contract itself shows Hull to have had a one-third interest. This partnership continued only until June, 1867, and it was dissolved by reason of the criticism visited upon Hull by his railway superiors by reason of the fact that he had purchased timber for the use of the company from himself. It shows, further, that Baldwin was familiar with the method of entering government lands on military land warrants. Further, that, after Hull's retirement from the firm, he continued to purchase the timber manufactured by R. A. Connolly & Co., taken in part from the lands standing in his own name on behalf of the railway, upon one occasion going upon the lands and selecting the

particular timber to be cut for the railway needs. Further, that he himself took one Hopkins, who was contemplating purchasing an interest in the concern, to one of the logging camps then in operation upon the lands, and introduced him to O'Brien as the one who would come there in charge, and Hopkins thereafter bought an interest in the firm; that later, when the Hartmans bought in, Hull had knowledge of the sale and continued to deal with the concern. The record further discloses that at this time the entire known value of the land in question consisted in its timber, and that Hull stood by and saw the land gradually divested of its value, purchasing the product for the railroad company without asserting any rights thereto. The contract between the Hartmans and Connolly and Johnson, which in terms described and dealt with the lands in question, was likewise made in his lifetime and recorded in the county of Marquette.

The defendants rely:

(1) Upon the fact that the record title stands in Hull's name; (2) upon the tax receipt dated January 10, 1871, for the taxes of 1870, which was made out in the name of Alfred Hull and produced by the defendant; (3) the payment of certain taxes upon the lands by the estate of Alfred Hull, all made prior to the year 1888; and (4) declarations made by Hull in his lifetime which the defendants claim tend to show that Hull during his lifetime, and after his disposition of his interest in the copartnership, still claimed to be the owner of the lands in question.

It was the theory of the defendants that, by an agreement between Baldwin, Connolly, and Hull (as to which agreement there is no evidence in the record), the legal title to the lands entered in their individual names should be and remain in them as individuals, while the partnership had the right to remove the timber therefrom, and this theory seems to have been accepted by the learned circuit judge. His opinion is, in part, as follows:

"The complainants cannot claim that they have by direct proof shown any express agreement that the lands in question were partnership property. They seem to rely

upon circumstances, dealings, and acts of the parties. In order to establish the fact, these circumstances, dealings, and acts should in convincing weight be the equivalent of an express agreement. In other words, they should be so clear and unequivocal that they would amount to proof of the fact. * * *

"It seems to us that, in order for the complainants to prevail here, it ought to appear:

" (1) That the property was purchased with partnership funds for partnership purposes; and (2) that it was used by the partnership for its purposes.

"Both of these propositions should appear, and they should concur. Where the articles of partnership and the books of account fail to show the necessary facts, the inference that the lands held individually, or by partners as tenants in common, were in fact partnership property, can only be drawn from facts capable by no possibility of any other reasonable construction than that the land was purchased with partnership funds for partnership purposes; and, if from the facts the inference may be reasonably against partnership ownership, that inference must be adopted. * * *

"By the record title these lands were the individual property of Alfred Hull. That title could only pass from him by an agreement or contract of some kind. The complainants have failed to show such an agreement. No witness has been produced who testifies to any such understanding. The partnership agreement does not show any such understanding. It is silent as to any lands. The books of account do not show any such understanding. They are silent as to these lands. No dealing of the firm while Hull was a member shows such an understanding. No statement of any member of the firm to any third person of such an understanding is produced. It is not shown that this land was purchased with the firm's money, nor that the firm paid the taxes at any time."

In his conclusions and his application of the facts to the law, we believe that the learned circuit judge was in error. It is clear that no express agreement is necessary; but we are of opinion that it is not necessary that " these circumstances and dealings should in convincing weight be the equivalent of an express agreement." This is not the law. Whether or not land taken in the name of one or more

partners is in fact partnership property always depends upon the intent of the parties and the understanding and design under which they acted. It is clear that an express agreement may show this intent; but it may also be established by an implied agreement. This implied agreement may be gathered by considering the general purpose of the parties, the nature of their business, and the manner in which they have dealt with the property in question. See *Lindsay* v. *Race*, 103 Mich. 28 (61 N. W. 271), where this court said:

" Whether lands held in the name of one partner or of both are to be deemed copartnership property is generally a question of intent to be gathered from the manner in which the members of the firm have dealt with them."

In *Way* v. *Stebbins*, 47 Mich. 296 (11 N. W. 166), this court said:

"The rule in this State has been well settled that property purchased with a design that it should become partnership property, and actually used in accordance with that design, must be regarded as firm assets."

See, also, *Richards* v. *Manson*, 101 Mass. 482; *Arnold* v. *Wainwright*, 6 Minn. 358 (80 Am. Dec. 448).

In *Ames* v. *Ames*, 37 Fed. 30, the court said:

"And following the suggestions there made, it may be affirmed that no written agreement is necessary; that no parol express agreement even is necessary, for a court of equity to hold that real estate standing in the names of individual partners is partnership property, and it is enough if, from all the acts and conduct of the partners, the court can be satisfied that it was the thought and intent of the partners to treat it as partnership property. * * *

" But it is said by counsel for defendants that the legal title was taken in the names of the individual partners; that the fact that the conveyances were so made indicates the intent to make the property individual rather than partnership property; and that, in the absence of an express agreement, in order to establish an implied agreement that this property, whose title was thus located in the individual partners, was to be partnership property, the fact shown must be such as to be necessarily inconsist-

ent with the intent to leave the ownership where the title deeds put it. I cannot agree with counsel's view of the significance of the conveyances and the location of the legal title.    *    *    *"

In the same case the court quoted with approval the following from *Morrison* v. *Mendenhall*, 18 Minn. 232:

"A conveyance of real estate, or of an interest therein, must run to some person (a corporation being regarded in law as a person), and a partnership, as such, not being a person, conveyances of real estate for the use and benefit of a partnership have usually and aptly been made to the individual partners jointly, as tenants in common"—citing cases.

In *Tidd* v. *Rines*, 26 Minn. 201 (2 N. W. 497), the court said:

"As the legal title to real property can only be held by a person, or a corporate entity, which is deemed such in law, it follows that the conveyance in question vested no legal title or estate in the grantee therein named, because a partnership, as such, is not recognized in law as a person."

As therefore, under the laws of Minnesota, a conveyance to the partnership was not the proper mode of transferring title, it would be strange if the conveyance to the individual partners carried with it that significance and potency which counsel for defendants claim. On the contrary, it seems to me the rule is, as heretofore indicated, that, in the absence of express agreement, no one matter is conclusive upon the question of intention; and that, from all the facts, the court is to deduce and determine the real intent of the partners. See, also, *Waterer* v. *Waterer*, 15 L. R. Eq. 402.

The court below said that it should appear:

"(1) That the property was purchased with partnership funds; and (2) that it was used by the partnership for its purposes. Both of these propositions should appear, and they should concur. Where the articles of partnership and the books of account fail to show the necessary facts, the inference that the lands held individually, or by part-

ners as tenants in common, were in fact partnership prop-
erty, can only be drawn from facts capable by no possibil-
ity of any other reasonable construction than that the land
was purchased with partnership funds for partnership
purposes."

In _Merritt_ v. _Dickey_, 38 Mich. 41, Chief Justice CAMP-
BELL, at page 44, said:

" The law has always been settled in this State that
real property which actually was designed to be, and
which was in fact treated during the existence of the firm,
as partnership assets, must be so regarded in equity, and
the legal estate must be held by the heirs of a deceased
partner as trustees for the equitable purposes of the firm."

We are of opinion that it is not necessary to show that
the partnership property was purchased with partnership
funds. Land standing in the name of an individual part-
ner may have been contributed by him as his portion or a
part of his portion to the firm assets. The true method of
determining, as between the partners themselves, whether
land standing in the name of the individuals is or is not
to be treated as partnership property, is to ascertain from
their conduct and course of dealing the understanding and
intention of the partners themselves, which, when ascer-
tained, should unquestionably control.

What was the understanding of the partners? They
needed land with timber upon it for the success of their
enterprise. They were met at the outset with the fact
that they could not enter those lands in the name of the
copartnership. The lands selected had at the time no
known value except the timber standing thereon. As to
Baldwin and Connolly, there can be no doubt that they
considered all the lands so entered as partnership assets.
They purchased, or believed they purchased, from Hull
his interest not alone in the mill, but in the lands. When
they sold thereafter, they sold not alone an interest in the
mill and the lands standing in their individual names, but
likewise an interest in the lands standing in Hull's name,
and finally, when Connolly and the Hartmans, who had

purchased from Baldwin, sold to Johnson—still in the lifetime of Hull—they warranted title not alone to the lands held by themselves, but likewise to the lands standing in the name of Hull.   We do not think it can be said that "the books of account fail to show the necessary facts." The books themselves at this late date could not be produced, and it is no more possible to say that they fail to disclose the necessary facts than it is to assert that they contain the necessary entries.   That Hull's understanding and intention was the same as that of his partners—about which there can be no doubt—we think sufficiently appears.   He was the least able of any of the three financially to sustain his proportion of the burden.   The partnership contract shows that:

" The proceeds of lumber sold, after reserving the cost of sawing *and furnishing*, are to be applied, first, to the payment of bills," etc.

His letter of August 30, 1886, to A. R. Connolly, contains the following:

" I shall keep the work moving in your absence.   There is one fact that is plain to be seen: *If the concern is made to pay for itself*, we have got to put our shoulders to the wheel."

He (Hull), as before noticed, stood by and saw the lands to which he had legal title divested of their value, and purchased the product thereof.   He knew of the conveyance of Baldwin to Oliver, and of Baldwin to the Hartmans, which dealt not alone with the timber, but with the lands themselves, to which he had title.   In 1871, four years after he had left the copartnership, in appending a list of his assets to his will, he did not include the lands in question, although he did include 540 acres of land in Delta county, an undivided one-third interest in which he owned with R. A. Connolly, and he did include a note of Baldwin and Connolly for $560.38, which he had received for his interest in the copartnership.   The fact that he omitted to include these lands is conclusive in the mind of the court as to his understanding.   It cannot

be said that it was an oversight, because he included other lands which he owned with Connolly at the time. His attention thereby being directed to his relations with Connolly and their joint holdings, and by the mention of the note received from Connolly and Baldwin for the purchase of his interest in the copartnership, his attention was particularly drawn to the partnership enterprise. His failure to include the lands in question in this suit therefore is equivalent to a declaration on his part that he had no interest therein.

A further significant fact is that in the final account of his estate the lands are not included, although the schedule attached to the final account contains 29 descriptions, and recites that it is a schedule of the real estate belonging to the estate of Alfred Hull, deceased, remaining undisposed of and subject to the order of the court. Opposed to this mass of evidence is the fact that the legal title stands in the name of Alfred Hull, and that the defendants produced a tax receipt for the year 1870 in his name. No testimony is introduced tending to show under what circumstances Hull paid the taxes, or whether in fact he did pay them. His business relations with Baldwin and Connolly appear to have continued to be of an intimate character even after the dissolution of the partnership, and, as shown by his will, he was interested with Connolly in other lands. His estate continued to pay taxes on the lands for some years, but discontinued payment prior to 1888. His declarations made after the dissolution of the partnership, relied upon by the defendants, as to his continued ownership of the lands, when carefully examined, do not *necessarily* refer to the lands in question. He owned other lands in the vicinity referred to, and in making the statements relied upon may have had those in mind. In any event, they must be regarded as self-serving in character, and as such are entitled to little consideration from the court.

We think the case at bar should be considered, on the one hand, as if Baldwin and Connolly were the complain-

ants, and, upon the other, as if Alfred Hull were the defendant. The complainants hold the title of Baldwin and Connolly, and the defendants rest upon the title of Alfred Hull. This being true, we are of opinion that the learned circuit judge, in relying upon the cases of *Reynolds* v. *Ruckman*, 35 Mich. 80, and *Hammond* v. *Paxton*, 58 Mich. 393 (25 N. W. 321), was in error. In each of those cases the rights of third parties, strangers to the copartnership, were involved; whereas, in the case at bar, as above intimated, it is the rights of the partners themselves, as between each other, we are called upon to determine.

It is clear to the court that, if Alfred Hull himself were standing as the defendant here asking affirmative relief at the hands of the court against these complainants, as the defendants at bar do, he would, under the state of facts set forth, be held to be estopped. While it is true that in this State title to real estate cannot be passed by estoppel (see *Hayes* v. *Livingston*, 34 Mich. 384 [22 Am. Rep. 533]), and such a defense cannot be relied upon in an action at law, nevertheless in equity the rule is different.

In *Hayes* v. *Livingston, supra*, Chief Justice Cooley said:

" Equity may always compel the owner of the title to release it where that is the proper redress for a fraud committed by him in respect to the title. * * * And when one asserts that the owner of land ought to surrender it to him because of the owner's fraudulent acts and conduct, it is manifest that his claim is only an equitable claim, set up and asserted against the legal claim. The one has the legal title, and the other seeks to overthrow it by providing a superior equity. This he may be able to do in a court of equity; but we cannot admit that at law the legal title is not entitled to prevail."

Again, in *Moran* v. *Palmer*, 13 Mich. 367, the same judge said:

" It is a well-settled principle of equity that if a man, having a title to an estate which is offered for sale, knowingly allows another to sell it to a purchaser who supposes

the title to be good, without, at the time, asserting his title, he shall be bound by the sale, and neither he nor his privies shall be allowed to dispute its validity "—citing many authorities.

After a careful examination of all the evidence in the record, we are of opinion: That the complainants show by a fair preponderance of the evidence that the lands in question, although entered in the name of Alfred Hull, were in fact always considered by him and his partners as partnership property; that they were dealt with during the lifetime of Hull, with his knowledge, as partnership property; that they were regarded by him, when he was engaged in so solemn an act as preparing his last will and testament, as belonging to his associates, and not to himself; and that they should now be so treated.

The decree of the court will be reversed, and a decree will be entered in this court in accordance with the prayer of the bill of complaint. A decree will likewise be entered in this court in the second case upon the footings of this opinion, in accordance with the prayer of the bill of complaint.

GRANT, MONTGOMERY, HOOKER, MOORE, and MCALVAY, JJ., concurred with BROOKE, J.

OSTRANDER, J. (*concurring*). I concur in the conclusions announced in the opinion of Mr. Justice BROOKE. I base concurrence, mainly, upon the terms of the articles of partnership and the nature of the business contemplated. The business was sawing and selling lumber. Logs were required for sawing. They had to be, and were, acquired after the articles were executed. Whether they were bought from individuals, or were cut from lands, they had to be in some way paid for just as the sawmill and fixtures had to be paid for. I can refer that provision in the articles which requires that each partner shall "pay one-third of the whole cost" to no particular item of expenditure. It was operative during the existence of the partnership, and, used as it is in connection

with "losses," cannot be said to mean merely the cost of the mill. Presumptively, in equity, as at law, the holder of the legal title owns the land. It is established that these partners made separate entries or purchases of land, and it may be safely assumed that the lands entered by each were not of equal value—did not involve the expenditure of the same amount of money. There was, however, but one purpose in buying them, and it is not easy to understand how the cost of the principal adventure could be shared equally and the profits divided equally, pursuant to the agreement, unless each paid one-third of the cost of the lands. I think it must be presumed that the cost of the land in question was paid by the partnership.

The cases of *Reynolds* v. *Ruckman*, 35 Mich. 80, and *Hammond* v. *Paxton*, 58 Mich. 393 (25 N. W. 321), are not controlling for the reason that defendants did not acquire title in reliance upon the records of title.

BLAIR, C. J., concurred with OSTRANDER, J.