PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and McCullough, JJ., and Koontz, S.J.

MARK A. GRETHEN

v. Record No. 161417

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
November 22, 2017

ARNOLD DAVID ROBINSON,
CHIEF OF CORRECTIONS OPERATIONS,
VIRGINIA DEPARTMENT OF CORRECTIONS, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
John W. Brown, Judge

Mark A. Grethen, an inmate, challenges the trial court's determination that he could not proceed *in forma pauperis* with his petition for a writ of mandamus. We conclude that he should have been afforded *in forma pauperis* status under Code § 8.01-691 and, accordingly, we will reverse the trial court's judgment.

BACKGROUND

Grethen is an inmate in the Virginia Department of Corrections ("the Department") – as well as a prolific litigator. On June 23, 2016, he filed a petition for a writ of mandamus in the Circuit Court for the City of Chesapeake, complaining of lack of access to computers, an inadequate legal database, and denial of photocopy services. He sought to file his mandamus petition *in forma pauperis*, that is, without paying the filing fee that ordinarily must be paid to institute a case. He submitted an affidavit *in forma pauperis* averring that he had no available funds with which to pay the fee.

Consistent with Code § 8.01-691, Grethen attached several documents to his petition that detailed the history of his inmate trust account. A "Trust Certificate of Account History" generated by the Department showed "total deposits" of $25.14 and "total withdrawals" of $25.14 for the period beginning on February 12, 2016, and ending on May 17, 2016. The same

documents showed a zero balance at the end of each month, as well as an "average monthly balance" of zero dollars. Another Trust Certificate of Account History for the period of February 1, 2015, to February 1, 2016, showed "total deposits" of $183.37 and "total withdrawals" of $183.39, along with a zero balance at the end of each month and an "average monthly balance" of zero dollars. His "offender monthly trust statements" showed postage loans for legal mail, loans for "medical co-pay," and loans for legal photocopies. Grethen also filed with the court a "Response to Trust Certificate of Account History," arguing that the trust account statements generated by the Department inaccurately reflected his financial resources.

The court denied Grethen's request to proceed *in forma pauperis*, holding that Grethen had to pay the filing and services fees or the action would be dismissed without prejudice. This appeal followed.

ANALYSIS

Code § 8.01-691 provides in relevant part:

> A prisoner seeking in forma pauperis status shall provide the court with a certified copy of his inmate trust account for the preceding twelve months. . . . If the court determines the prisoner has had no deposits in his inmate trust account for the preceding six months, the court shall permit the prisoner to proceed without paying the filing fee and costs.

We review a trial court's interpretation of a statute de novo. *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007).

I. THE DEPARTMENT'S POLICIES AND PROCEDURES EXPLAIN THE "LOANS" AND "DEPOSITS" THAT APPEAR ON INMATE TRUST ACCOUNT DOCUMENTATION.

Grethen, who was seeking *in forma pauperis* status, "provide[d] the court with a certified copy of his inmate trust account for the preceding twelve months." Code § 8.01-691. The statements from his trust accounts reflect "deposits" and "loans" but also show a zero balance

from month to month.  The Virginia Department of Corrections' Operating Procedure governing offender finances explains what these "deposits" and "loans" mean.  *See* Virginia Department of Corrections Operating Procedure 802.2: Offender Finances (June 1, 2016).

Each inmate is provided with an "offender trust account."  Virginia Department of Corrections Operating Procedure 802.2 § IV(B), at 2 (June 1, 2016).

> The purpose of the Offender Trust Account is to hold monies earned by offenders for work performed while committed to the DOC and to allow them to use such earnings to pay legal obligations, to purchase goods from the commissary and other DOC Contract Vendors, to send to individuals and entities designated by the offender, and to provide an allowance to them upon their release.

*Id.* § IV(B)(2), at 3.  Outside sources can, subject to restrictions, deposit money in a trust account.  *Id*. § IV(B)(3), at 3; § IV(C)(3) at 3-4.

The Department withholds funds from the trust account for a variety of reasons, and places funds into separate accounts:  a hold account, a court obligation account, a personal trust account, a reserve account, and an account for loans and other charges.  *Id.* § IV(C)(8), at 4-5.  What remains goes into what is referred to as the spend account, which an inmate can use at his discretion.  *Id.* § IV(C)(8)(f), at 5.  The operating procedure explains that "loans and other charges" are "funds withheld for the repayment of debits against the offender's account for medical co-pay, legal postage . . .  legal copies," and other charges.  *Id.* § IV(C)(8)(e), at 4-5.

On the subject of photocopies, the operating procedure provides that

> [w]hen an offender is unable to pay for copies in response to a Court requirement, copies should be provided and the cost debited to the offender's account.  Any offender who has an account debit in excess of $50 for photocopies will not be provided any further photocopies unless the offender presents a Court order instructing the facility to provide the offender additional photocopying service loans.

*Id.* § IV(A)(6), at 2.

When an inmate incurs "legal mail postage charge in excess of the spend account balance," the excess will "be debited against the offender's account as a loan." *Id.* § IV(G)(4)(a), at 7. In the event that "an offender, who has a legal mail postage debt, receives additional funds or pay, the funds will be used to satisfy the debt." *Id.* § IV(G)(4)(b), at 7.

Although no offender is denied access to necessary health care due to lack of funds, the Department assesses a "co-payment" for health care services. Virginia Department of Corrections Operating Procedure 720.4: Co-Payment for Health Care Services § I, at 1 (August 1, 2017). For example, the Department charges five dollars for a doctor visit. *Id.* § IV(C)(1), at 2. The Department assesses the co-payment charge against an inmate's spend account, but such charges "may not reduce the offender's account below $5.00; any amount still owed on the co-pay charge should be debited against the offender's account to be paid when their spend account exceeds $5.00." Operating Procedure 802.2 § IV(G)(5)(a), at 7.

II. THE VALUE OF SERVICES FOR PHOTOCOPIES, LEGAL MAIL, AND MEDICAL CO-PAYS, AND THE INMATE'S OBLIGATION TO REPAY THE DEPARTMENT FOR THE VALUE OF THOSE SERVICES, DO NOT CONSTITUTE A "DEPOSIT" WITHIN THE PLAIN MEANING OF THAT TERM.

Under the relevant provision of Code § 8.01-691,

> If the court determines the prisoner has had no deposits in his inmate trust account for the preceding six months, the court shall permit the prisoner to proceed without paying the filing fee and costs.

The parties diverge about the meaning of the term "deposit." The Commonwealth argues that the inmate trust account reflects the existence of loans which are properly treated as deposits in Grethen's trust account. Grethen responds that these are not true deposits as that term is commonly understood.

4

The "primary objective of statutory construction is to ascertain and give effect to legislative intent. A related principle is that the plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, or strained construction." *Turner v. Commonwealth*, 226 Va. 456, 459, 309 S.E.2d 337, 338 (1983) (citation omitted). Black's Law Dictionary defines a "deposit" as "1. The act of giving money or other property to another who promises to preserve it or to use it and return it in kind . . . 2. The money or property so given." Black's Law Dictionary 533 (10th ed. 2014). Webster's Third New International Dictionary defines deposit as "the state of being deposited in trust or safekeeping," "the state of being deposited to one's credit in a bank," and "something placed (as in a bank or in someone's hands) for safekeeping: as . . . money that is deposited in a bank or with a banker, that is subject to order, and that creates the relationship of creditor and debtor." Webster's Third New International Dictionary 605 (1993).

In this instance, the Department labels the services it provides for legal mail, photocopies, and medical co-payments as "loans," which the Department in turn treats as "deposits" in the inmate's trust account. The Department's use of the term "deposit" in this fashion falls outside the scope of ordinary meaning. The "deposits" at issue are clearly not analogous to an ordinary bank deposit, where the depositor places funds in the custody of the bank. In that situation, the depositor can use the funds for any purpose. Here, the Department does not deposit any actual money in an inmate's account. Instead, the "deposits" are an artificial accounting device designed to place an internal value on certain services, such as health care, that the Department has provided to an inmate. The inmate never has access to actual funds from these "deposits" to pay all or part of a filing fee. Although it is not unusual to bill for services, it is highly unusual to label a debt owed for such services as a "deposit," particularly when the account is shown – by

5

the Department of Corrections' own trust account reporting system – as having a zero balance despite these "deposits." Finally, debts owed for photocopies, legal mail, or medical care are not analogous to property deposited in a safe-deposit box at a bank for safekeeping.

The point of Code § 8.01-691 is to compel courts to grant *in forma pauperis* status to inmates who have received no deposits in their inmate trust account in the preceding six months of actual funds that could be devoted to paying court fees. Services the Department provides to inmates, which the Department artificially labels "deposits" for accounting purposes, do not constitute deposits for purposes of Code § 8.01-691.[1] We also do not perceive a legislative intent to force inmates to choose between receiving health care and pursuing a legal remedy.

The "deposits" reflected in Grethen's trust account documents are thus not "deposits" within the ordinary meaning of the term. The trust account statements also reflect that Grethen did not have any real "deposits" in his inmate trust account, as that term is ordinarily understood, within the preceding six months. Given the absence of actual "deposits," we hold that the trial court erred in denying Grethen *in forma pauperis* status under Code § 8.01-691.[2]

---

[1] We note that inmates who have received actual deposits in the preceding six months may still be granted *in forma pauperis* status, in the court's discretion, depending on the inmate's available resources. Code § 8.01-691. Furthermore, Code § 8.01-692 provides that "[t]he court shall deny in forma pauperis status to any prisoner who has had three or more cases or appeals dismissed by any federal or state court for being frivolous, malicious, or for failure to state a claim," subject to the exceptions listed in Code § 8.01-692.

[2] Our holding is not intended as a criticism of the Department or its practices. The Department is subject to audit and it must account to the General Assembly for its expenses, including the postage, photocopy, and medical expenses it incurs on behalf of inmates. There is thus nothing amiss with the Department keeping track of these expenditures and affixing a label to such expenditures for accounting purposes. Our holding is simply that the Department's idiosyncratic use of the label "deposit" for these services does not fall within the plain, ordinary meaning of the term as it is used in Code § 8.01-691.

6

CONCLUSION

We will reverse the judgment below and remand for further proceedings not inconsistent with this opinion.

*Reversed and remanded*.

JUSTICE McCLANAHAN, with whom JUSTICE POWELL joins, dissenting.

The Virginia Department of Corrections incurred expenses on behalf of Grethen for postage and photocopies that he generated "as a prolific litigator" while in prison, as the majority acknowledges. His affidavit in support of his *in forma pauperis* request specifically shows that he was $257.57 in debt to the Department for "legal copies and legal postage loans." The payment of those expenses by the Department represents "[a]n expenditure of money," Black's Law Dictionary 698 (10th ed. 2014)—i.e., "real" money collected from the taxpayers of Virginia and spent on Grethen's behalf for prolific litigation. The money necessary to cover those expenses was deposited into Grethen's inmate trust account as loans and then withdrawn for payment. This procedure is analogous to a bank depositing money into a customer's bank account and then immediately withdrawing it to cover an overdraft. Unquestionably, when that occurs, a "true deposit" of "real" money has been made. True deposits of real money were likewise made into Grethen's inmate trust account by the Department to cover his expenses for postage and photocopies within the six months preceding the filing of his mandamus petition, under either Black's or Webster's dictionary definitions of "deposit" cited by the majority. When that has occurred (without regard to amount), Code § 8.01-691 provides that the trial court has discretion in deciding whether to grant an inmate *in forma pauperis* status and, if the court does not, that inmate may not proceed with an action "without paying the filing fee and costs." If exceptions to this legislative mandate are to be made, it is up to the legislature to make them.

7

*See Vasquez v. Commonwealth*, 291 Va. 232, 246-47, 781 S.E.2d 920, 928 (2016) ("As we have often said, the legislature is the 'author of public policy.'" (quoting *In re Woodley*, 290 Va. 482, 490, 777 S.E.2d 560, 565 (2015)). Thus, I would hold that deposits were made to Grethen's account and affirm the circuit court's exercise of discretion in denying Grethen *in forma pauperis* status, and therefore respectfully dissent.