PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, Callins and Senior Judge Humphreys
Argued at Leesburg, Virginia


DANETTE MERTZ, ET AL.

v.      Record No. 0261-23-4

CYNTHIA SULLIVAN, ET AL.


CYNTHIA SULLIVAN, ET AL.

v.      Record No. 0266-23-4

DANIAL SELARIO, AS ADMINISTRATOR OF
  THE ESTATE OF CHRISTOPHER SELARIO, ET AL.

OPINION BY
JUDGE ROBERT J. HUMPHREYS
DECEMBER 10, 2024

DANIAL SELARIO, AS ADMINISTRATOR OF
  THE ESTATE OF CHRISTOPHER SELARIO, ET AL.

v.      Record No. 0271-23-4

CYNTHIA SULLIVAN, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge

Robert H.J. Loftus (McCandlish Lillard, PC, on briefs), for Danette
Mertz, individually.

Jonathan R. Mook (Michael S. Lieberman; Bernard J. DiMuro;
David Z. Kaufman; DiMuro Ginsberg, PC; Kaufman Law Group, on
briefs), for Daniel Selario in his representative and individual
capacity and Danette Mertz in her representative capacity.

Max F. Maccoby (Washington Global Law Group PLLC, on
briefs), for Cynthia Sullivan and Shannon Mahar.


These consolidated appeals arise from an acrimonious business split among family

members. Sisters Cynthia Sullivan and Nicola J. Brintzenhofe, later joined by Sullivan's

daughter Shannon Mahar, agreed to own and operate Curves for Women franchises through two separate LLCs. While that business relationship was ongoing, the three women and another sister, Danette Mertz, separately entered into a partnership to own and operate several Massage Envy franchises. Sullivan and Mahar left the Massage Envy partnership in March 2010, and buyout negotiations were unsuccessful. Brintzenhofe died in November 2010 after transferring her business interests to a living trust. Her son, Christopher Selario, became the trustee and the executor of her estate. Sullivan and Mahar dissolved the Curves LLCs in 2012.

Sullivan and Mahar sued Mertz and Selario in his representative capacity regarding the Massage Envy partnership. They asked the circuit court to settle the partnership's accounts or alternatively require Mertz and Selario to buy out Sullivan and Mahar's partnership interest. The court dismissed the buyout claim as time-barred. Sullivan and Mahar's appeal of that ruling is docketed under Record No. 0266-23-4. But the court granted the accounting claim and ordered Mertz, Brintzenhofe's estate and trust, Selario, and the partnership to pay Sullivan and Mahar the value of Sullivan and Mahar's capital accounts. Mertz and Selario's appeal of that ruling is docketed under Record No. 0261-23-4.[1]

In his representative capacity, Selario sued Sullivan and Mahar, asking the court to wind up the Curves LLCs' business and alleging that Sullivan and Mahar had taken unlawful distributions. Sullivan and Mahar counterclaimed. The circuit court dismissed those counterclaims but ordered Brintzenhofe's trust and estate, as well as Selario in his individual capacity, to pay damages to Sullivan and Mahar. Selario appeals that decision, which is docketed under Record No. 0271-23-4.

---

[1] Christopher Selario has since passed away. Daniel Selario is the administrator of his estate and the party representing his interests on appeal. For clarity, we refer to both as "Selario."

BACKGROUND[2]

I. The Businesses

In 2001, sisters Brintzenhofe and Sullivan entered into an oral agreement to own and operate "Curves for Women" franchises together. They agreed that Brintzenhofe would fund the endeavor while Sullivan would operate the clinics, with each owning half of the business. In addition, Sullivan "would receive regular pay for operating the Curves locations." The agreement did not specify whether Brintzenhofe's funding would be classified as loans or capital contributions.

The circuit court found that the sisters intended "from the beginning of the Curves business" to operate it as LLC members rather than as partners. Brintzenhofe created SiS Company, LLC, to own the Curves franchises. SiS's articles of organization identified Brintzenhofe as a member but identified no other members. SiS did not have a written operating agreement. SiS opened its first Curves franchise in 2001, and more locations followed.

Sullivan's daughter, Mahar, joined the Curves business in 2002. Brintzenhofe created Shanicdy Company, LLC, to accommodate her. As before, the parties agreed that Brintzenhofe would fund the business while Sullivan and Mahar operated the clinics. And once again, the articles of organization identified Brintzenhofe alone as a member. Unlike SiS, however,

---

[2] We give a circuit court's factual findings following a bench trial "the same weight as a jury verdict." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 287 (2022) (quoting *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006)). "Those factual findings will not be disturbed on appeal unless they are plainly wrong or without evidence to support them." *Id.* Here, the circuit court made extensive findings of fact that are unchallenged unless otherwise noted.

Shanicdy had an operating agreement, which provided that Brintzenhofe, Sullivan, and Mahar were each members who would receive one-third of all profits and losses.[3]

SiS and Shanicdy each continued to open new Curves locations. A third sister, Mertz, entered the business in 2005 and opened two locations under a separate LLC that is not at issue in this appeal. Brintzenhofe provided the initial funding and performed the bookkeeping, accounting, and payroll for SiS and Shanicdy.

In 2007, Brintzenhofe, Mertz, Sullivan, and Mahar expanded into Massage Envy franchises. They executed three Massage Envy franchise agreements, with each woman signing the agreement in her own name. They consistently referred to each other as partners and held themselves out as such but did not execute a written partnership agreement.

At Brintzenhofe's suggestion, the partners agreed that each Massage Envy clinic would be owned by a separate LLC. Those LLCs would in turn be owned by another LLC that the partners would own together, each with a 25% interest. Brintzenhofe established Envy Group, LLC, as the holding company. Although Envy's articles of organization identified only Brintzenhofe as a member, all four women regularly held themselves out as principals of Envy. Brintzenhofe also created separate LLCs for each of the three Massage Envy franchises, all of which Envy owned: Rockville, NV, LLC; Arlington NV, LLC; and UNME, LLC. None of the Massage Envy LLCs had an operating agreement.

Along with the three franchise agreements the partners had executed previously, Rockville entered into a fourth franchise agreement. Initially, Rockville owned its Massage Envy franchise jointly with Back Kneads, LLC—an entity owned by nonparties to these cases. Rockville later purchased Back Kneads' interest for just under $200,000, which Brintzenhofe

---

[3] Shanicdy had three purported operating agreements, and the parties disputed below which of the three was authentic. On appeal, the parties do not dispute the circuit court's determination of which agreement controlled.

provided. The sale agreement for that transaction identified the four partners as owning 100% of Envy. Arlington and UNME also opened clinics of their own, with UNME's clinic known as "Lake Ridge." The other franchise license the partners had obtained lay dormant until the partnership sold it in 2013 for $29,000.

The Rockville and Arlington clinics opened in 2008, and the Lake Ridge clinic opened in May 2009. In September 2008, Brintzenhofe emailed Sullivan, explaining that she had invested $800,000 to support the Rockville and Arlington clinics and expected to increase her investment to about $1.2 million after Lake Ridge opened. She stated that she "plan[ned] on benefiting from" her investment but maintained that she was doing it for her family and "not doing [it] for [her]self." Sullivan, Mahar, and Mertz each understood that they would not be paid until the Massage Envy clinics became profitable. When Mahar later expressed concern about pay, Brintzenhofe clarified that she expected "loan repayments" for the money she had invested.

In late 2009, with the Curves business experiencing a downturn, Sullivan and Mahar proposed that they focus on Curves while Brintzenhofe and Mertz focused on Massage Envy. Brintzenhofe and Mertz agreed; by the end of the year, Sullivan and Mahar were no longer involved in the daily operations of the Massage Envy business.

In January 2010, Brintzenhofe proposed expanding the Arlington Massage Envy clinic, which Sullivan and Mahar opposed. On March 10, 2010, Sullivan emailed Brintzenhofe, writing that it was "time to talk about" Sullivan and Mahar "getting out of the Massage Envy partnership." The partners held a conference call later that day, during which Sullivan and Mahar again opposed the Arlington expansion. Brintzenhofe agreed that Sullivan and Mahar could withdraw from the business and asked them to make a buyout offer. Mertz executed the lease amendment for the Arlington expansion on March 24, 2010.

The next day, Sullivan emailed Brintzenhofe formally asking that Brintzenhofe and Mertz buy out Sullivan and Mahar's interest in the Massage Envy partnership. Sullivan requested reimbursement for time worked and 25% equity, but did not suggest a specific buyout amount, and noted that "[t]here [were] probably many ways it could be structured." She also suggested that the partnership sell the three Massage Envy clinics. Brintzenhofe responded that Sullivan's suggestion "[wa]sn't anywhere close to" a reasonable buyout proposal. Sullivan replied that she and Mahar "hadn't really" proposed a buyout agreement.

The parties communicated throughout March and April 2010 about a potential buyout. Brintzenhofe offered to pay Sullivan seven percent and Mahar five percent upon the sale of any Massage Envy clinic, plus two-thirds of the monthly management fee for the time they had worked at the clinics. Sullivan and Mahar rejected the offer, which was not reduced to writing. Meanwhile, the Arlington Massage Envy clinic expansion proceeded, and the clinic was operating at full capacity by September 2010.

Brintzenhofe passed away in November 2010. Before she died, she transferred her business interests to the Nicola J. Brintzenhofe Living Trust; her son, Selario, became the trustee upon her death, as well as the executor of her estate. At Mertz's request, another sister, Karee BrintzenhofeSzoc, helped represent the Trust from 2011 to 2015.

In the months after Brintzenhofe's death, Sullivan and Mertz discovered that the businesses' financial records were in disarray. As the circuit court later found, "[c]ertain financial records were missing, could not be constructed or never existed." For example, there were no contemporaneous profit and loss reports for any of the businesses from before Brintzenhofe's death. Mertz created a "general ledger" showing what she believed to represent the capital contributions, distributions, and other fees and expenses for SiS, Shanicdy, and the Massage Envy franchises. But Sullivan disputed Mertz's numbers.

Many of Brintzenhofe's entities had never filed tax returns, so the Trust hired accounting firm Aiken & Company to do so. Aiken received electronic storage devices and about 50 boxes containing documents from many entities mixed together. Aiken worked entirely with the Trust and did not receive any information from Sullivan or Mahar, relying primarily on the general ledger Mertz had created in 2010 that Sullivan believed was inaccurate. Aiken created its own general ledger from the information it received.

Throughout that process, the parties continued to dispute the businesses' assets. For example, Selario as trustee wrote three checks to Mertz for "back pay," which Sullivan complained was improper. Sullivan later withdrew $81,000 from the Rockville account, which BrintzenhofeSzoc demanded be returned. There were also about $2,000,000 in unaccounted-for credit card charges for SiS and Shanicdy. Sullivan and Mahar dissolved SiS and Shanicdy in 2012.

## II. Procedural Background

### A. The Complaints and Pretrial Rulings

In July 2015, Sullivan, Mahar, and the "Massage Envy Partnership," by and through Sullivan and Mahar, sued Mertz and BrintzenhofeSzoc, raising claims related to the Massage Envy partnership. (Nos. 0261-23-4 and 0266-23-4). Selario separately sued Sullivan and Mahar that same month, asserting claims related to the Curves LLCs. (No. 0271-23-4). The circuit court consolidated the cases.

Sullivan, Mahar, and the partnership later filed an amended complaint against Mertz and Selario in his role as Trustee and executor of Brintzenhofe's estate. In relevant part, Count I of the amended complaint requested a judicial dissolution and winding up of the Massage Envy partnership under Code § 50-73.117. Count III sought an equitable settling of accounts under Code § 8.01-31.

- 7 -

Mertz and Selario filed pleas in bar, which the circuit court partially sustained in June 2016. The court found that Count I was subject to a five-year statute of limitations under Code § 8.01-246, which began when Sullivan and Mahar dissociated from the partnership on March 10, 2010. Consequently, the court dismissed Count I with prejudice as time-barred. The court overruled the plea in bar on Sullivan and Mahar's accounting claim.

Sullivan and Mahar eventually filed a fourth amended complaint—the operative complaint in the Massage Envy litigation. In Count I of that complaint, which was labeled "Accounting of Partnership," Sullivan and Mahar asked the court to settle the partnership's accounts under Code §§ 8.01-31 and 50-73.123(B). They asserted that they had a right "to dissolve and windup the Partnership and its assets" under Code § 50-73.117(1). In Count II, they requested a judicial buyout of their partnership interests under Code § 50-73.112.

Selario filed an amended complaint soon after, asking the court to wind up the Curves LLCs' business under Code § 13-1049. He also asked the court to award him funds that "should have been distributions paid to the trust" but "were inequitably taken" from the LLCs by Sullivan and Mahar in violation of Code § 13.1-1035. Sullivan and Mahar counterclaimed, asking the court to settle the accounts of what they termed the SiS and Shanicdy "partnerships."

## B. The Financial Experts

The court held a bench trial over at least 13 nonconsecutive days in 2017.[4] Wayne Brown was Sullivan and Mahar's valuation expert for the Massage Envy partnership. Brown

---

[4] Despite the voluminous record, much is missing. The record contains transcripts for 13 days, but the parties indicated at one point that they were on the 19th or 20th day of trial. The trial transcript begins in the middle of cross-examination of Wayne Brown. The record is missing parts of Sullivan's testimony. There are references throughout the record to other witnesses who apparently testified but whose testimony is not in the record. And the last transcript of June 22, 2017, ends abruptly with a note that trial would resume on June 29, 2017. As we explain later, Brown's missing testimony is indispensable to resolving some of the assignments of error. We may resolve the remaining assignments of error without the missing transcripts.

valued Arlington at $2,612,849, Rockville at $882,861, and Lake Ridge at $454,547. He valued the dormant franchise license at $29,000. Thus, the total value for the partnership was $3,979,257. Brown did not deduct any loans from his calculations. He testified that any existing loan would reduce the valuation by the amount of the loan.

Brian Enverso was Sullivan and Mahar's accounting expert. Enverso started from Brown's $3,979,257 valuation. He assumed that each partner had a 25% interest in the partnership and shared all profits and losses equally. From there, he subtracted the value of the partnership's assets from Brown's valuation to determine how much profit the partnership would earn from liquidation, which he determined to be $2,915,690. He attributed 25% of that number to each partner's capital account as a credit, along with other credits such as the partner's individual contributions. He then calculated each partner's charges based on the partnership's liabilities and losses and any distributions the partner had received. Finally, he subtracted the partners' charges from their credits to determine the value of their individual capital accounts.

Although Enverso calculated each partner's capital account, his report submitted at trial showed only Sullivan and Mahar's accounts, not Brintzenhofe's or Mertz's. Enverso relied on Aiken's ledger to make his conclusions, which showed that Brintzenhofe had contributed $1,002,259.63 to the partnership, $200,000 of which was from the Back Kneads buyout. Enverso reclassified that buyout as having been funded by Envy rather than by Brintzenhofe. Accordingly, he divided it by 4 and credited $50,000 to each partner as a capital contribution.

Richard Wolf was Mertz and Selario's valuation expert. Wolf valued Arlington at $897,773, Rockville at $650,000, and Lake Ridge at $450,000, for a total value of $1,979,000.

Joseph Aiken of Aiken & Company testified for Sullivan and Mahar as a fact and expert witness. He calculated Brintzenhofe's, Sullivan's, and Mahar's capital accounts in SiS and Shanicdy and opined that Sullivan owed SiS and Shanicdy and Mahar owed Shanicdy "in

- 9 -

restoration of [their] capital account[s]." He also calculated the capital accounts for each of the four Massage Envy partners under various assumptions.

Brandon Jourdan was Sullivan and Mahar's expert witness regarding the Curves franchises. Jourdan assumed that Sullivan, Mahar, and Brintzenhofe each owned one-third of Shanicdy. Aiken had classified certain payments to Sullivan and Mahar as distributions; Jourdan reclassified some of those distributions as guaranteed payments that Sullivan and Mahar had received for working at Curves, which had the effect of increasing the value of their capital accounts. Jourdan concluded that Brintzenhofe's SiS capital account was negative $326,242 while Sullivan's was positive $182,490. He also concluded that Brintzenhofe's Shanicdy account was negative $147,245 while Sullivan's was positive $91,060 and Mahar's was positive $95,560. He opined that Brintzenhofe should pay SiS $105,903.29 because "the capital accounts were not in balance . . . because [Brintzenhofe] either had excess distributions or payments that were not equally done for [Sullivan's] account." He also opined that Brintzenhofe should pay Shanicdy $150,846 "to settle that account."

### C. The Court's Rulings

The circuit court issued a letter opinion in February 2022, nearly five years after the trial ended. Addressing the Curves litigation first (No. 0271-23-4), the court found that the parties had not formed a partnership but operated the Curves businesses solely as members of the relevant LLCs: Sullivan and Brintzenhofe as members of SiS; and Sullivan, Mahar, and Brintzenhofe as members of Shanicdy. Accordingly, the court dismissed Sullivan and Mahar's counterclaims because they sought a remedy that is available for partnerships only. Sullivan and Mahar do not challenge the court's dismissal of their counterclaims on appeal. The court found that Sullivan and Mahar had dissolved SiS and Shanicdy in 2012, which triggered the statutory requirement to wind up those LLCs' business.

Despite dismissing Sullivan and Mahar's accounting counterclaims, the court credited Jourdan's testimony about the value of each party's capital account. Accordingly, the court found that Brintzenhofe's estate owed SiS $105,903.79 and Shanicdy $150,846.15.

Turning to the Massage Envy litigation (Nos. 0261-23-4 and 0266-23-4), the circuit court dismissed Sullivan and Mahar's request for a judicial buyout after finding that claim time-barred. In the court's view, Sullivan's March 25, 2010 email was "a clear demand to be bought out" even though "it did not state a particular price or all of the details." Thus, the court held that demand for payment triggered the one-year limitations period, rendering the buyout claim untimely.

As for Sullivan and Mahar's accounting claim, the circuit court found that the parties had formed a partnership. The court explained that "Sullivan and Mahar['s] expressed . . . intention to withdraw and end their relationship" with the partnership, "had the effect of dissolving the partnership . . . and triggered an obligation to wind up the partnership." Therefore, Sullivan and Mahar were entitled to a settlement of the partnership's accounts.

The court found that Brown and Enverso provided the "more accurate conclusions as to the value of the Massage Envy franchises." It also found, however, that the $1,000,000 Brintzenhofe had paid the partnership were interest-free loans, not capital contributions.[5] The court therefore reduced Brown's valuation by $1,000,000 and repeated Enverso's calculations using the lower valuation. Using that method, the court concluded that Sullivan's capital account was positive $206,581 while Mahar's was $206,539. The court did not calculate either Brintzenhofe's or Mertz's accounts.

Sullivan and Mahar moved for reconsideration, arguing that the court's treatment of Brintzenhofe's loans resulted in double counting those payments. They submitted Enverso's

---

[5] No party objects to the trial court's use of $1,000,000 rather than $1,002,259.63.

worksheets, which were not previously before the court.[6] Those worksheets showed that Enverso had attributed $802,260 to Brintzenhofe's credits as a capital contribution. Consistent with his report, he also attributed $50,000 to each of the partners' credits as contributions from the Back Kneads buyout.

The court entered the final order in January 2023. The court ordered that Selario, the Brintzenhofe Trust, and Brintzenhofe's estate were each "jointly and severally liable" to pay Sullivan $105,903.79 and Mahar $150,846.15 for dissolution of the Curves LLCs: SiS and Shanicdy. That order differed from the earlier letter opinion, which identified Brintzenhofe's estate as the sole liable party. The court also ordered that Mertz, the Massage Envy Partnership, Selario, the Brintzenhofe Trust, and Brintzenhofe's estate were all "jointly and severally liable" to pay Sullivan $473,340 and Mahar $473,297 in accounting for the Massage Envy Partnership. Those amounts were considerably higher than the amounts found in the court's earlier letter opinion. The order did not explain the difference or how the court calculated the final numbers.

ANALYSIS

I. Standards of Review

This Court reviews questions of law de novo. *Willems v. Batcheller*, 78 Va. App. 199, 213 (2023) (statutes of limitation); *Taylor v. Commonwealth*, 77 Va. App. 149, 162 (2023) (statutory interpretation); *Cnty. of Henrico v. O'Neil*, 75 Va. App. 312, 321 (2022) (res judicata). By contrast, rulings on the admissibility of evidence are reviewed for abuse of discretion. *Davenport v. Util. Trailer Mfg. Co.*, 74 Va. App. 181, 206 (2022). "When a trial court renders judgment after a bench trial, [this Court] cannot set aside that judgment as contrary to the

---

[6] Earlier, the trial court had sustained an objection to Enverso's worksheets as a trial exhibit. The parties later agreed to withdraw all objections to trial exhibits, which the trial court endorsed in an order stating that "[a]ll exhibits proposed by the parties shall be admitted." Enverso's worksheets are not in the record as exhibits but are included in Sullivan and Mahar's motion to reconsider.

- 12 -

evidence 'unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.'" *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (quoting Code § 8.01-680).

"The 'primary objective of statutory construction is to ascertain and give effect to legislative intent.'" *Grethen v. Robinson*, 294 Va. 392, 397 (2017) (quoting *Turner v. Commonwealth*, 226 Va. 456, 459 (1983)). We determine that intent "from the plain meaning of the language used." *Street v. Commonwealth*, 75 Va. App. 298, 306 (2022) (quoting *Hillman v. Commonwealth*, 68 Va. App. 585, 592-93 (2018)). "A statute is not to be construed by singling out a particular phrase." *Eberhardt v. Fairfax Cnty. Emps.' Ret. Sys. Bd. of Trs.*, 283 Va. 190, 194-95 (2012) (quoting *Va. Elec. & Power Co. v. Bd. of Cnty. Supervisors*, 226 Va. 382, 387-88 (1983)). Rather, we evaluate the statutory language in the context "of the entire statute" because "it is our duty to interpret the several parts of a statute as a consistent and harmonious whole." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012) (quoting *Eberhardt*, 283 Va. at 194-95). We "will not consider any portion [of a statute] meaningless unless absolutely necessary." *May v. R.A. Yancey Lumber Corp.*, 297 Va. 1, 14 (2019) (quoting *Logan v. City Council*, 275 Va. 483, 493 (2008)).

II. Massage Envy (Nos. 0261-23-4 and 0266-23-4)

A. Overview of Partnership Law

The Virginia Uniform Partnership Act governs partnerships in Virginia. Code §§ 50-73.79 to -73.150. A partnership is "an association of two or more persons to carry on as co-owners of a business for profit . . . whether or not the persons intend to form a partnership." Code §§ 50-73.79, -73.88. A "partnership at will" exists when "the partners have not agreed to remain partners until the expiration of a definite term or the completion of a particular undertaking." Code § 50-73.79.

Partners share profits and losses equally. Code § 50-73.99(B). A partner who loans money to the partnership generally has the same rights and obligations as a non-partner creditor. Code § 50-73.85. When a partner contributes capital to the partnership other than a loan, however, that contribution is credited to the partner's "capital account." Code § 50-73.99(A). Each partner has a capital account with that partner's credits and charges. *Id.* A partner's credits include the value of any money or property the partner contributed to the partnership and the partner's share of the profits. Code § 50-73.99(A)(1). A partner's charges include the value of any money or property the partnership distributed to the partner and the partner's share of the losses. Code § 50-73.99(A)(2).

A partner may dissociate from the partnership in several ways. Code §§ 50-73.109, -73.117. Some dissociations cause the partnership to dissolve while others do not. Code § 50-73.117. Relevant here, a partner may dissociate by providing "notice of the partner's express will to withdraw as a partner on a later date." Code § 50-73.109(1). If the partnership is at-will, that express dissociation automatically dissolves the partnership and causes its business to wind up. Code § 50-73.117(1). A partner may also request that the court dissolve the partnership because it is not reasonably or economically practicable to carry on. Code § 50-73.117(5).

If a partner's dissociation does not cause the partnership to dissolve, a dissociated partner may force the remaining partners to buy out her interest in the partnership. Code §§ 50-73.111, -73.112(A). The dissociated partner may sue the partnership to determine the buyout price but must do so "within 120 days after . . . an offer to pay or within one year after written demand for payment if no payment or offer to pay is tendered." Code § 50-73.112(I).

Alternatively, if a partner's dissociation causes the partnership to dissolve and wind up its business, the partnership's assets are first "applied to discharge its obligations to creditors,

including . . . partners who are creditors." Code §§ 50-73.111, -73.123(A). Then "each partner is entitled to a settlement of all partnership accounts." Code § 50-73.123(B). So "[a]ny surplus" partnership assets are used "to pay in cash the net amount distributable to partners in accordance with their right to distributions." Code § 50-73.123(A).

When settling the partnership's accounts, any profits and losses from liquidating the partnership's assets are credited and charged to each partner's capital account. Code § 50-73.123(B). The partnership makes a distribution to each partner "in an amount equal to any excess of the credits over the charges in the partner's account." *Id.* If a partner has a negative account balance, that partner "shall contribute to the partnership an amount equal to any excess of the charges over the credits" in their account. *Id.* "The estate of a deceased partner is liable for the partner's obligation to contribute to the partnership." Code § 50-73.123(F).

### B. No. 0261-23-4

Mertz and Selario collectively raise 20 assignments of error in Record No. 0261-23-4. But they provide no argument or supporting authority for three of them.[7] An appellant's opening brief must contain "argument (including principles of law and authorities) relating to each assignment of error." Rule 5A:20(e). "Unsupported assertions of error 'do not merit appellate consideration.'" *Fadness v. Fadness*, 52 Va. App. 833, 850 (2008) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)). "[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a[n assignment of error] as waived.'" *Atkins v. Commonwealth*, 57 Va. App. 2, 20 (2010) (second alteration in original) (quoting *Parks v. Parks*, 52 Va. App. 663, 664 (2008)). Mertz and

---

[7] Specifically, Mertz and Selario's fifth, tenth, and thirteenth assignments of error are unsupported.

Selario's failure to provide argument and supporting authorities is significant, so the three affected assignments of error are waived.

The remaining assignments of error can be grouped into six general categories. As detailed below, many of their remaining arguments rely on faulty premises that find no support in the record. Their challenge to the circuit court's settlement of accounts has merit, however, because the circuit court only settled half of the accounts. Accordingly, we reverse the circuit court's damages award and remand for further proceedings.

1. Res Judicata

Mertz and Selario contend that Count I of Sullivan and Mahar's fourth amended complaint was barred by res judicata because, in their view, the circuit court dismissed an identical claim in the amended complaint in July 2016 with prejudice. We disagree.

Count I of the amended complaint asked the circuit court to dissolve the partnership under Code § 50-73.117(5)(b) and (c). Those provisions allow a partner to seek a judicial dissolution after the court finds that it is not reasonably practicable to continue the partnership. Code § 50-73.117(5)(b), (c). By contrast, Count I of the fourth amended complaint asserted that Sullivan and Mahar had a "right" to dissolution under Code § 50-73.117(1). That subsection provides that a partnership-at-will, like the Massage Envy partnership, is *automatically* dissolved when a partner provides notice "of that partner's express will to withdraw as a partner." Code § 50-73.117(1). Properly read, the amended complaint asked the circuit court to dissolve the partnership, while the fourth amended complaint asserted that the partnership had dissolved already and asked the court to settle the partnership's accounts. Rather than mirroring Count I of the amended complaint, Count I of the fourth amended complaint most resembled Count III of the amended complaint, which sought an equitable accounting and which the circuit court had not dismissed. Thus, res judicata does not bar Count I of the fourth amended complaint.

- 16 -

Rejecting Mertz and Selario's res judicata argument also resolves their claim that Sullivan and Mahar were not entitled to a settlement of accounts under Code § 50-73.123 because the partnership had not dissolved. "Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business." Code § 50-73.123(B). The circuit court found that the partnership dissolved when Sullivan and Mahar dissociated, triggering the statutory requirement that the partnership wind up its business. Apart from their res judicata argument, Mertz and Selario do not challenge that finding on appeal. Because the partnership had dissolved, the circuit court did not err in concluding that settling the accounts under Code § 50-73.123 was appropriate.

Finally, "[a]n accounting in equity may be had against any fiduciary . . . for receiving more than comes to his just share or proportion, or against the personal representative of any such party." Code § 8.01-31. Mertz and Selario argue that the Partnership Act "is a comprehensive scheme for partnerships" and that the accounting provisions in the Act foreclose more general statutory provisions governing other fiduciary relationships, including Code § 8.01-31. But circuit courts have applied Code § 8.01-31 to partnership disputes. *Morrison v. Alton*, 109 Va. Cir. 5, 6 (Fairfax Cir. Ct. 2021). And the Supreme Court has applied the statute to an estate's personal representative's request for an accounting from the decedent's fiduciaries, demonstrating the statute's broad scope. *Campbell v. Harmon*, 271 Va. 590, 596-600 (2006). In any event, we need not decide whether the Partnership Act and Code § 8.01-31 are mutually exclusive. The circuit court did not differentiate between the two statutes or apply different principles, and neither party argues on appeal that the statutes provide different remedies. Because the circuit court correctly found that Sullivan and Mahar were entitled to an accounting under Code § 50.73-123(B), its finding that Sullivan and Mahar also were entitled to an accounting under Code § 8.01-31 was at most harmless error.

## 2. Statute of Limitations

Mertz and Selario argue that Sullivan and Mahar's accounting claim was time-barred. "[A]ctions by a partner against another for settlement of the partnership account" must be brought "within five years from the cessation of the dealings in which they are interested together." Code § 8.01-246(A)(3). "[O]ne partner's right of action against others, arising out of the affairs of the partnership . . . begins to run only when the winding up of the affairs of the dissolved partnership has been completed." *Roark v. Hicks*, 234 Va. 470, 475 (1987); *see also Hodge v. Kennedy*, 198 Va. 416, 422-23 (1956). Winding up a partnership's business includes discharging the partnership's obligations to creditors, including "partners who are creditors." Code § 50-73.123(A). It is undisputed that the partnership had not wound up its business when Sullivan and Mahar filed suit. Accordingly, Sullivan and Mahar's accounting claim was timely.

## 3. LLCs as Partnership Assets[8]

"The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force." Code § 1-200. "A statutory provision will not be held to change the common law unless the legislative intent to do so is plainly manifested." *Isbell v. Com. Inv. Assocs.*, 273 Va. 605, 613 (2007) (quoting *Herndon v. St. Mary's Hosp., Inc.*, 266 Va. 472, 476 (2003)). "Statutes in derogation of the common law are to be strictly construed and not to be enlarged in their operation by construction beyond their express terms." *Id.* (quoting *Chesapeake & Ohio Ry. Co. v. Kinzer*, 206 Va. 175, 181 (1965)). "When an enactment does not encompass the entire subject covered by the common law, it abrogates the common-law rule only to the extent that its terms are directly and

---

[8] Mertz and Selario assert that "[t]he trial court erred in piercing the veil of the Massage Envy LLCs." Beyond a perfunctory objection to the final order, the parties did not argue about piercing the veil below, nor does Mertz and Selario's opening brief discuss that doctrine. Any argument about piercing the veil is therefore defaulted under Rule 5A:18 and waived under Rule 5A:20(e).

irreconcilably opposed to the rule." *Id.* at 614 (quoting *Boyd v. Commonwealth*, 236 Va. 346, 349 (1988)).

At common law, whether property belonged to a partnership "depend[ed] upon the intent of the parties and the understanding and design under which they acted . . . considering the general purpose of the parties, the nature of their business, and the manner in which they . . . dealt with the property in question." *Klingstein v. Rockingham Nat'l Bank*, 165 Va. 275, 280 (1935) (quoting *Johnson v. Hogan*, 123 N.W. 891, 897 (Mich. 1909)).

Under Code § 50-73.90(A), property belongs to the partnership if acquired in the partnership's name or by "[o]ne or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership." Code § 50-73.90(B) defines when property is acquired in the name of the partnership. Subsections (A) and (B) abrogate the common law; if their conditions are met, the acquired property is partnership property regardless of the parties' intent.

Subsections (C) and (D) of Code § 50-73.90, however, operate differently. Under subsection (C), "[p]roperty is *presumed* to be partnership property if purchased with partnership assets." Code § 50-73.90(C) (emphasis added). And subsection (D) creates a *presumption* that property acquired in a partner's name and without the use of partnership assets or reference in the transfer document to the partnership is separate property, "even if used for partnership purposes." Code § 50-73.90(D). Where the necessary facts giving rise to the presumption are proven, "the presumption must be applied . . . until evidence sufficient to overcome the presumption and prove the contrary shall have been introduced." *Kiddell v. Labowitz*, 284 Va. 611, 622 (2012) (quoting *Simpson v. Simpson*, 162 Va. 621, 642 (1934)). "The primary significance of a presumption is that it operates to shift to the opposing party the burden of

producing evidence tending to rebut the presumption." *Id.* (quoting *Martin v. Phillips*, 235 Va. 523, 526 (1988)).

Code § 50-73.90 gives no guidance on the type of evidence that can rebut the presumptions in subsections (C) and (D). Therefore, we look to the common law. And the common law asks whether the parties intended property to belong to the partnership. *Klingstein*, 165 Va. at 180. At least one commentator has agreed that the parties' intent remains relevant in determining whether property belongs to a partnership. Michie's Jurisprudence of Virginia & West Virginia, *Partnership*, § 21 (2024).

Brintzenhofe created the LLCs in her own name and the transfer instruments do not reference the partnership, making subsection (A) inapplicable. Arguably, subsection (C) applied to the extent the LLCs were funded with loans Brintzenhofe made to the partnership. *Cf. Callison v. Glick*, 297 Va. 275, 283 (2019) (describing a loan as an asset). But even if the LLCs are presumed to be separate property under subsection (D), Sullivan and Mahar presented sufficient evidence to overcome the presumption. The partners executed the Massage Envy franchise agreements in their own names before transferring those franchises to the LLCs. And the partners repeatedly expressed their intent to operate the partnership through the LLCs. The evidence is overwhelming that the parties intended the LLCs to belong to the partnership and not to Brintzenhofe alone. Therefore, the circuit court correctly treated the LLCs as partnership property.[9]

---

[9] Beyond relying on Code § 50-73.90(D), Mertz and Selario assert that "[t]he theory of the Fourth Amended Complaint was that Brintzenhofe held the ownership of the LLCs in trust for the partnership." They then claim that Sullivan and Mahar failed to prove an oral trust and that, in any event, the trust would be invalid if not in writing. Their arguments about trust law are irrelevant. The fourth amended complaint alleged that "[t]he Partners agreed that th[e] LLCs were wholly owned by the Partnership," Brintzenhofe "informed her Partners that she was organizing the LLCs for the benefit of the Partnership," and Brintzenhofe "formed the LLCs for the benefit of the Partners" as an agent of the partnership. It alleged that she transferred the LLCs to a trust before she died, not that she held them in trust for the partnership during her

### 4. Brown's Valuation

"On appeal, we presume the judgment of the trial court is correct and the burden is on the appellant to present to us a sufficient record from which we can determine whether the trial court has erred in the respect alleged by appellant." *Bay v. Commonwealth*, 60 Va. App. 520, 528 (2012). "The transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court no later than 60 days after entry of the final judgment." Rule 5A:8(a). "This deadline may be extended by a judge of this Court only upon a written motion filed within 90 days after the entry of final judgment." *Id.* "When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered." Rule 5A:8(b)(4)(ii). "If . . . the transcript [or statement of facts] is indispensable to the determination of the case, then the requirements for making the transcript [or statement of facts] a part of the record on appeal must be strictly adhered to." *Bay*, 60 Va. App. at 528 (alterations in original) (quoting *Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986)). "This Court has no authority to make exceptions to the filing requirements set out in the Rules." *Shiembob v. Shiembob*, 55 Va. App. 234, 246 (2009) (quoting *Turner*, 2 Va. App. at 99); *see also Bay*, 60 Va. App. at 528-29. The decision to review a case on appeal without a relevant transcript is "the rare exception rather than the general rule." *Wolfe v. Commonwealth*, 6 Va. App. 640, 644 (1988).

Mertz and Selario argue that the circuit court erred by relying on Brown's valuation. But they provided only part of Brown's testimony, starting in the middle of cross-examination. Without Brown's direct testimony or even the full cross-examination, we are without any basis for a

---

lifetime. And the trial court did not find that the LLCs belonged to the partnership based on a trust relationship. "An assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court . . . is not sufficient." Rule 5A:20(c)(2). Therefore, we do not consider those arguments.

determination regarding error on the part of the circuit court. Therefore, we cannot address Mertz and Selario's assignments of error related to Brown's valuation. *See* Rule 5A:8(b)(4)(ii).

## 5. Settling the Accounts

Code § 50-73.123 establishes the process for a settlement of accounts. Before accounts can be settled, the partnership must reimburse creditors, including partners who are creditors. Code § 50-73.123(A). After determining the amount due to any creditors, the court settles the accounts "among the partners." Code § 50-73.123(B). An equitable accounting involves two steps: "First, the account is to be stated; this is a determination of who owes what. Second, the account is to be settled; this is the payment by the debtor of the money found to be owing." *Comtois v. Rogers*, 282 Va. 289, 298 (2011) (quoting W. Hamilton Bryson, *Bryson on Civil Procedure* § 12.02 (4th ed. 2005)). In other words, "the liabilities of the partnership must be satisfied" first and then "any residual surplus be distributed among the partners." *Id.* at 299.

To settle the accounts properly, the court must calculate the accounts of each partner. *Id.* at 299-300. A court "fail[s] to perform the accounting necessarily inherent in a winding up" when it fails to make factual findings concerning the value of the partners' respective account balances or direct the repayment of any excessive withdrawals or distribution of any surplus. *Id.* The remedy in an accounting proceeding is to determine "who owes what." *Id.* at 300. Thus, a partner with a negative account must "contribute to the partnership an amount equal to" that negative amount. Code § 50-73.123(B). But Code § 50-73.123 does not require a partner with a positive account to pay another partner with a positive account, let alone require a partner with a larger capital account to pay a partner with a smaller one.

The circuit court found that Brintzenhofe's payments were loans, rather than capital contributions. It is undisputed that Brown did not account for those loans in his valuation. Loans are liabilities that the partnership must repay; as Brown testified, they affect the amount a

- 22 -

buyer would be willing to pay for the business and so would reduce the valuation. Code § 50-73.123(A); *Rogers*, 282 Va. at 299. Given that, the circuit court reasonably reduced Brown's valuation by $1,000,000. But the circuit court did not otherwise deviate from Enverso's calculations, which treated most of Brintzenhofe's payments as capital contributions. By reducing Brown's valuation but not otherwise modifying Enverso's calculations, the circuit court treated some payments as both loans *and* capital contributions, resulting in the double count of which Sullivan and Mahar complained in their motion to reconsider.

The court's failure to settle all the accounts led it to misapprehend the effect of that double count. Again, the court found that the $802,260 that Enverso credited to Brintzenhofe's account and the $50,000 Back Kneads contributions that Enverso credited to each partner's account were loans, not capital contributions. To avoid double counting those payments, the court should have omitted them from the account calculations altogether because loans must be repaid before calculating the capital accounts. Code § 50-73.123(B). Omitting those loans would have reduced Sullivan and Mahar's capital accounts by $50,000 each. But had the court calculated each partner's account, the main effect of counting the payments solely as loans would have been to reduce Brintzenhofe's capital account in recognition that the partnership owed her that money before settling the accounts. Code § 50-73.123(A). In other words, the main effect of the circuit court's initial double counting error was not reflected at all in the damages award because the court did not calculate Brintzenhofe's capital account or order the partnership to pay her anything.

The court's reconsideration in its final order did not fix the problem. The court did not explain how it calculated the damages in the final order or why its numbers differed from those stated in the letter opinion. According to Sullivan and Mahar, the court reduced Brown's valuation by $1,000,000 and then credited each of them (and Mertz) with one-third of the

$802,260 capital contribution that Enverso attributed to Brintzenhofe. The math nearly lines up,[10] but that approach credits every partner other than Brintzenhofe as having made capital contributions they did not make, while still counting the payments twice.

We are mindful that "[n]o court can . . . render its judgment upon a right, however meritorious, which has not been pleaded and claimed." *Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp.*, 221 Va. 1139, 1141 (1981) (quoting *Potts v. Mathieson Alkali Works*, 165 Va. 196, 207 (1935)). The fourth amended complaint requested "[a] settlement of partnership accounts under [Code] § 50-73.123(B)." That pleading implicates a settlement of *all* partnership accounts, not just Sullivan and Mahar's. Settling Brintzenhofe's and Mertz's accounts would not have gone outside the pleadings and was required for the circuit court to make a proper settlement. Accordingly, we reverse the circuit court's damages award and remand for a settlement of the partnership's accounts consistent with this opinion.

### 6. Selario's Personal Liability

Finally, Selario argues that the circuit court erred by holding him jointly and severally liable. Sullivan and Mahar respond that the circuit court properly held Selario personally liable because he benefitted from Brintzenhofe's allegedly wrongful distributions.

"It is elementary that one is not bound by a judgment *in personam* resulting from litigation . . . to which he has not been made a party." *McCulley v. Brooks & Co. Gen. Contrs., Inc.*, 295 Va. 583, 589 (2018) (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 110 (1969)). "[A] person who sues or is sued in his official or representative capacity is, in contemplation of law, regarded as a person distinct from the same person in his individual capacity and is a stranger to his rights or liabilities as an individual."

---

[10] For example, the letter opinion found that Sullivan was owed $206,581. Adding one-third of $802,260 to that number equals $474,001, which is close but not exact to the $473,340 the court awarded Sullivan in the final order.

*Monroe v. Monroe*, 302 Va. 387, 393 (2023) (quoting *Reineck v. Lemen*, 292 Va. 710, 722 (2016)). This rule applies to executors of an estate. *See, e.g.*, *Hawthrone v. VanMarter*, 279 Va. 566, 575-76 (2010).

In contesting this general rule, Sullivan and Mahar rely on an 1887 case holding that executors may be liable in their individual capacities and judgment may be rendered against them if they personally engage in wrongdoing. *Belvin's Ex'rs v. French*, 84 Va. 81, 83 (1887) (alleging that the executors of an estate negligently damaged the estate's property). The "general principle" protecting a personal representative from liability did not apply in *Belvin's* because "the action [wa]s not against the defendants in their representative capacity, but [wa]s against them personally." *Id.*

Here, by contrast, the fourth amended complaint named Selario as a defendant only in his roles as trustee and executor, not in his personal capacity. Sullivan and Mahar concede that "Selario [wa]s not personally named as a defendant." Although they alleged that Selario benefitted from Brintzenhofe's alleged wrongdoing, they did not allege in the complaint that Selario himself engaged in any wrongdoing related to the Massage Envy partnership for which he could be personally liable. And the circuit court never found that Brintzenhofe had made any wrongful distributions for Selario's benefit. Accordingly, the circuit court erred in finding Selario personally liable.

Finally, Sullivan and Mahar also cite the "clean-up" doctrine, which allows a court sitting in equity to "grant *appropriate* relief not specifically requested," including remedies available only at law. *Worsham v. Worsham*, 74 Va. App. 151, 175 (2022) (emphasis added). However, they ignore the context in which that word is used. "Appropriate" modifies the relief allowed—it is not appropriate to order relief against a non-party to a case. *McCulley*, 295 Va. at 589.

- 25 -

### C. No. 0266-23-4

Sullivan and Mahar argue in this appeal that the circuit court erred by dismissing their judicial buyout claim as time-barred. A dissociated partner must bring an action against the partnership to determine the buyout price "within 120 days after the partnership has tendered payment or an offer to pay or within one year after written demand for payment if no payment or offer to pay is tendered." Code § 50-73.112(I). Here, the circuit court determined that Sullivan's March 25, 2010 email to Brintzenhofe was a demand for payment triggering the limitations period.

"[W]e decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). As we have already established, a buyout is available only when a partner's dissociation does not cause the partnership to dissolve. Code § 50-73.111. The circuit court, at Sullivan and Mahar's request, found that the partnership had dissolved, limiting them to the accounting remedy and foreclosing their buyout remedy by operation of law. Thus, even if the circuit court erred in dismissing the buyout claim as untimely, that error was harmless because the buyout claim was mutually exclusive from the accounting claim on which the court granted relief.

### III. Curves Litigation (No. 0271-23-4)

### A. LLC Overview

A limited liability company is an unincorporated organization that is governed by the Virginia Limited Liability Company Act. Code §§ 13.1-1000 to -1099.27. An LLC is created by articles of organization and may be governed by an operating agreement that sets parameters for operating the LLC. Code §§ 13.1-1002, -1011, -1023. LLCs have members who are entitled to share in its profits and losses. Code §§ 13.1-1002, -1038.1. Each member has an "interest" in

the LLC, which is their "share of the profits and losses . . . and the right to receive distributions of the [LLC]'s assets." Code § 13.1-1002.

Members may make contributions to the LLC "in cash, property, or services rendered." Code § 13.1-1027(A). The LLC is required to keep a record of each member's contributions and the right of any member to receive distributions. Code § 13.1-1028(A)(5). Unlike a partnership, LLC members do not share profits and losses equally; rather, the LLC allocates profits and losses "on the basis of the value . . . of the contributions made by each member" unless otherwise specified in the articles of organization or operating agreement. Code § 13.1-1029. And unless otherwise specified in the articles of organization or operating agreement, the LLC makes distributions based on the value "of the contributions made by each member." Code § 13.1-1030.

The articles of organization or operating agreement may entitle a member to interim distributions before the LLC winds up its business as long as those distributions comply with certain statutory restrictions. Code §§ 13.1-1031, -1035. For example, an LLC may not make a distribution that would render the LLC unable to pay its debts or would result in the LLC's assets being worth less than its liabilities. Code § 13.1-1035(A). Distributions do "not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business." Code § 13.1-1035(E). "If a member has received a distribution in violation of the articles of organization or an operating agreement or in violation of [Code] § 13.1-1035 . . . the member is liable to the" LLC for up to two years after the wrongful distribution. Code § 13.1-1036.

An LLC may be dissolved "[u]pon the unanimous written consent of its members." Code § 13.1-1046(2). When an LLC dissolves, the liquidating trustees wind up the LLC's business, dispose of or convey the LLC's property, discharge the LLC's liabilities, and distribute any

- 27 -

remaining assets to the LLC's members. Code § 13.1-1048(C). During the windup process, the LLC first pays any creditors from its remaining assets. Code § 13.1-1049(1). It then pays members to satisfy their liabilities for distributions under Code § 13.1-1031. Code § 13.1-1049(2). Finally, the LLC returns contributions to its members "first" and "second" pays members "with respect to their interests . . . in the proportions in which the members share in distributions." Code § 13.1-1049(3).

### B. Selario's Personal Liability

Selario argues that the circuit court erred by holding him personally liable in the Curves litigation. We agree that the circuit court erred in holding Selario personally liable for the same reasons discussed in the previous section.

### C. The Circuit Court's Remedy

Selario makes two primary challenges to the circuit court's remedy. First, he argues that the court erred to the extent it ordered Brintzenhofe and Selario to repay wrongful distributions under Code § 13.1-1036 because that remedy went outside the pleadings and was barred by the statute of limitations. In the alternative, he argues that the court erred to the extent that it ordered Brintzenhofe and Selario to repay negative capital balances because, unlike the Partnership Act, the LLC Act does not require such a remedy. Sullivan and Mahar do not argue that the LLC Act requires that negative account balances be repaid but assert that the circuit court ordered the repayment of excess distributions under Code § 13.1-1036. We agree with Sullivan and Mahar that the circuit court's final order did not balance the capital accounts but instead relied on Code § 13.1-1036. Accordingly, we will not address whether the LLC Act requires that members with

negative capital accounts reimburse the LLC upon winding up.[11] But we agree with Selario that the circuit court erred in applying Code § 13.1-1036.

As noted above, "no court can . . . render its judgment upon a right, however meritorious, which has not been pleaded and claimed." *Ted Lansing Supply Co.*, 221 Va. at 1141 (quoting *Potts*, 165 Va. at 207). In his complaint, Selario requested that Sullivan and Mahar repay *their* wrongful distributions under Code § 13.1-1036. Unlike an action to settle a partnership's accounts—which contemplates that the court will settle all of the partnership's accounts—a claim that specific members are liable to the LLC for wrongful distributions under Code § 13.1-1036 does *not* ask the court to determine whether any member took wrongful distributions. And Selario's request that the circuit court "[g]rant such other and further relief that the Court finds just and equitable" did not ask the circuit court to grant Sullivan and Mahar relief at Selario's expense. Sullivan and Mahar illustrated the point in closing argument when they asked the circuit court to dismiss Selario's claim but find him liable under *their counterclaims* in the amount that the court ultimately awarded them. But the circuit court had dismissed those counterclaims, and so could not award damages under them.

Further, an LLC member is liable for making a wrongful distribution for only two years after making the distribution. Code § 13.1-1036. Brintzenhofe died nearly 5 years before Selario filed this lawsuit and about 12 years before the court found her estate liable.

---

[11] Moreover, Selario presented Aiken as its expert witness in LLC accounting and submitted Aiken's report stating that the final step of winding up an LLC's business is to pay "individual members on the basis of their respective capital balances." Aiken's report stated that Sullivan and Mahar owed SiS and Shanicdy "in restoration of their capital accounts." The first time Selario argued that the LLC Act does not require negative capital accounts to be repaid was in his objections to the final order. "[A] party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." *Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020) (quoting *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009)).

Consequently, any claim under Code § 13.1-1036 fell outside both the pleadings and the statute of limitations, thereby rendering the court's remedy erroneous.

CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand to the circuit court for further proceedings consistent with this opinion. Specifically, we reverse the circuit court's damages award in No. 0261-23-4 and remand for the court to settle all the partnership accounts. We otherwise affirm the circuit court in No. 0261-23-4. We also affirm the circuit court's dismissal of Sullivan and Mahar's buyout claim in No. 0266-23-4. And we reverse the circuit court's judgment in No. 0271-23-4 and remand for further proceedings.

*Affirmed in part, reversed in part, and remanded.*